FREE STATE BANK & TRUST COMPANY *v.*
A. JAMES ELLIS

[No. 865, September Term, 1979.]

*Decided March 7, 1980.*

The cause was argued before GILBERT, C. J., and THOMPSON and LISS, JJ.

*James C. Chapin,* with whom were *John C. Joyce* and *Duckett, Orem, Christie & Beckett* on the brief, for appellant.

*Anthony J. McMahon,* with whom were *Anderson,*

*Pendleton, McMahon, Peet & Donovan* on the brief, for appellee.

*Amicus curiae* brief submitted by *Thomas P. Smith, Shelly E. Mintz* and *Baskin & Sears* for John and Claire M. Buete.

GILBERT, C. J., delivered the opinion of the Court.

Free State Bank & Trust Company (Bank) has come to this Court in an effort to reverse a judgment of $80,000 against it for negligence in releasing collateral that had been pledged in order to secure a loan. At the same time the Bank seeks to vacate a post-trial order of the Circuit Court for Montgomery County in which that court awarded certain substituted collateral to the appellee, A. James Ellis. The Bank is joined in the latter effort by John and Claire M. Buete, who assert that the post-trial order deprived them of their property without due process of law. We, by order, permitted the Buetes to file an *amicus curiae* brief in the case. For the reasons stated *infra,* we affirm the judgment entered on the jury's verdict, but we vacate the post-trial order.

## — THE FACTS —

Ellis was a member of the Board of Directors of the Bank and of its Executive Committee. In March 1974, Ellis obtained a loan from the Bank for $300,000. As collateral for the loan, Ellis furnished the Bank with a second deed of trust on his residence, but because his equity in the home was insufficient, he assigned to the Bank a promissory note in the amount of $200,000, payable to Ellis by Mr. Jerry Wolman. The note was secured by a second deed of trust on Wolman's home. Both the Wolman note and the second deed of trust had been held by Ellis as security for debts owed to Ellis by Wolman and W. W. A., Inc., a Wolman owned corporation. Ellis did not participate in the Board of Directors' vote on the loan.

Subsequently, Wolman had a buyer for his residence, and he approached Ellis for a release of the collateral in order that he could effect the sale. Ellis said that Wolman should work

it out with the Bank, and that anything they agreed to do would be all right with him so long as he remained secured. The record is not clear as to exactly what next happened, but there came a time when the Board of Directors of the Bank was asked to accept a "wraparound deed of trust" in the amount of $160,000, securing a note for the same sum, as collateral for the loan to Ellis instead of the $200,000 collateral previously posted. The substitution of the collateral was discussed and a vote taken. Ellis abstained from voting. It is clear from the testimony that the Board voted approval. The "wraparound deed of trust" and note it secured were payable to Wolman by Dr. and Mrs. John H. Palmer, the purchasers of the Wolman residence. Wolman endorsed the Palmer note to the Bank as follows:

> "Pay to the order of Freestate [*sic*] Bank to be held
> as collateral and for collection.
>
> s/   Jerry Wolman"

The note recites that it is "[s]ubject to further terms and conditions as set forth in Deed of Trust bearing even date and securing" Wolman. The trustees under the Palmer-to-Wolman deed of trust seemingly remained as trustees. Notwithstanding the authorized release of the Ellis Deed of Trust, the $200,000 note from Wolman to Ellis is still in possession of the Bank.[1]

Dr. and Mrs. Palmer, for a time, divided their payments between Suburbia Federal Savings and Loan, the holder of the first deed of trust on the Palmer residence, and the account of Wolman at Free State. After Wolman assigned his interest in the Palmer note to the *amici,* Mr. and Mrs. Buete, the Palmer payments were credited to the account of the Buetes.

Somewhere along the way, Ellis became aware of the fact that the Bank had released his secured interest in the Wolman residence and had received in substitution what he described

---

1. The Bank argues that while it agreed to accept the $160,000 Palmer-to-Wolman note secured by a wraparound second deed of trust in lieu of the Wolman-to-Ellis second deed of trust, it did not agree to release the $200,000 note that was secured by that deed of trust.

as "a piece of paper, one hundred sixty thousand dollars, from Dr. Palmer to Mr. Wolman. What value it is to me, I don't know."

Ellis sued the Bank in a five count declaration. The trial judge directed verdicts as to two counts and the case went to the jury on count I, breach of contract; count II, negligence; and count III, conversion. The jury found for Ellis on the negligence count, and as we have previously stated, assessed his damages in the amount of $80,000.

The Bank advances three reasons why it believes the trial court should be reversed. We shall discuss each issue in the order they have been put to us by the Bank.

## I.

"The trial court erred in denying the Bank's motion for directed verdict where Ellis failed to introduce evidence of the commercially reasonable standard of care to which the Bank was held."

The Bank, in its argument, seeks to have us adopt a rule that expert testimony is required in order to establish a negligent deviation from the "commercially reasonable standard" against which the Bank's actions are to be measured, citing, *Crockett v. Crothers,* 264 Md. 222, 285 A.2d 612 (1972); *Tempchin v. Sampson,* 262 Md. 156, 277 A.2d 67 (1971); *Johns Hopkins Hospital v. Genda,* 255 Md. 616, 258 A.2d 595 (1969); and *Fink v. Steele,* 166 Md. 354, 171 A. 49 (1934). The Bank contends that such testimony is needed "to provide the jurors with any understanding of the 'commercially reasonable' standard against which they were to measure the Bank's actions." Because Ellis produced no expert testimony, the Bank concludes that he failed to meet the burden of proof and that, therefore, the trial court should have directed a verdict in the Bank's favor.

The Bank then quotes from *Third National Bank v. Boyd,* 44 Md. 47, 64, 22 A.R. 35, 41 (1874), where the Court said a bank was "'to exercise such care and diligence in the custody or keeping of them [a customer's bonds] as at the time, banks

of common prudence in like situations and business, usually bestowed in the custody and keeping of similar property belonging to themselves. . . .' " The Bank interprets that language, in the light of *Crockett, Tempchin, Genda* and *Steele,* to mean that "expert testimony" must be produced by a plaintiff, suing a bank for negligence, to establish the reasonable and accepted standard of care that banks in the community exercise in their dealings with customers, and then demonstrate that the defendant bank failed to meet that standard. The Bank, in the instant case, asserts that the reasonably accepted standards, dealing with transactions such as that involved in the matter *sub judice,* are "assuredly beyond the common knowledge of the jurors." We have a different view.

Although there may be situations that necessitate expert testimony relative to the standard of care required of a bank in dealings with customers, this case is not of that category. Certainly, no expert testimony was needed to show that banks do not ordinarily release the collateral of a customer and take in substitution thereof a paper writing which is not collateral, and which does no more than allow the bank to collect monies due on the collateral and credit it to the account of another. No expert testimony is needed to show the jurors that banks do not ordinarily release a deed of trust that secures a $200,000 promissory note payable to the bank's customer and which has been assigned to the bank as collateral for the customer's loan, and accept as substitute collateral a note secured by a deed of trust, payable to a party other than the bank's customer, and which is not even assigned to the bank, except, for all practical purposes, for collection. No expert testimony is needed to demonstrate to the jury that by doing what it did in the instant case, the Bank stripped its customer of his security for a $200,000 loan to another party.

There are situations in medical malpractice cases that are so grossly negligent as not to require expert testimony relative to the standard medical care in the community, as, *e.g.,* where the wrong leg is amputated, the wrong tooth is extracted, the wrong patient is subjected to an operation. *See McClees v. Cohen,* 158 Md. 60, 148 A. 124 (1930) (dentist

extracted wrong tooth); *Suburban Hospital Association v. Hadary,* 22 Md. App. 186, 322 A.2d 258 (1974) (doctor performed liver biopsy using unsterile needle). *See also* Annot., 81 A.L.R.2d 597, and cases cited therein. We think that even if expert testimony is ordinarily needed to prove the standard of reasonable care used by banks in the community in its dealings with its customers, the case now before us is of the type that the average juror would know without expert testimony that banks simply do not ordinarily do what the Appellant Bank did in this case. No expert testimony was required to demonstrate the negligence of the Bank in its release of the Wolman deed of trust to Ellis.

## II.

"The trial court erroneously denied the Bank's motion for directed verdict on the grounds that Ellis failed to produce evidence of the value of the property which was allegedly diminished in value by the negligence of the Bank."

The short answer to the Bank's argument is that Ellis did testify that had foreclosure proceedings been instituted on the Wolman Deed of Trust, there was sufficient equity available in the Wolman residence to satisfy Wolman's debt to Ellis. That testimony, if believed, was sufficient to show the value of the property that was negligently released from the encumbrance of the deed of trust. The Bank, however, points out that it still has the $200,000 Wolman note which it says is "unimpaired and viable." The Bank claims that Ellis' allegation that the note is valueless is but a bald assertion, pointing out that a holder of a note may reduce it to judgment without foreclosing on property that secured the note. *Alexander v. Hergenroeder,* 215 Md. 326, 332, 138 A.2d 366, 369 (1957). Indubitably, the note may be reduced to judgment, but the collateral for the payment of the judgment, the deed of trust, had been released. Based on the testimony of Ellis, as long as the deed of trust remained viable, he was certain that he was protected to the full extent of the note. Once the deed of trust was released, he was left with a paper writing

evidencing a debt, but providing no assurance that it would or could be paid.

Additionally, there was testimony from a witness for the Bank that the $160,000 substitute note was worth $80,000. Thus, the jury may have concluded, in arriving at its verdict of $80,000, that Ellis had suffered an $80,000 loss. Moreover, the note supposedly given by Wolman as substitute collateral was not even payable to Ellis, nor was he secured in any fashion by the "wraparound deed of trust."

We think the trial judge properly denied the Bank's motion for a directed verdict.

## III.

"The trial court acted beyond the scope of its authority when it ordered an award of damages beyond that authorized by the jury verdict."

On the same day that the court entered judgment on the jury's verdict, Ellis filed a "Motion to Clarify Verdict and Judgment." The motion advised the court that the jury had been instructed that "the $160,000 'wraparound' [deed of trust] was the property of . . . Ellis. . . ." The motion sought to have the court so order and to direct that when the Ellis obligation to the Bank "is finally paid" the "$160,000 'wraparound' " be turned over to Ellis. Notwithstanding the Bank's objection, the judge, on May 15, 1978, entered an order which read in pertinent part:

"ORDERED that in addition to the judgment entered in favor of the plaintiff for $80,000 the plaintiff is the owner of, and entitled to the return of, the $160,000 note pledged as collateral with Free State Bank & Trust Company, the defendant, at such time as that loan is paid in full, including accrued interest. The plaintiff, as well, is entitled to have all payments made on the $160,000 note applied to reduce his indebtedness with Free State Bank & Trust Company and after that debt is paid in full all payments made on the note between the time of

payment of the loan and transfer of the note to the plaintiff should be paid to the plaintiff."

Our review of the trial judge's jury instructions does not confirm Ellis's statement that the jury was instructed that the $160,000 "wraparound deed of trust" was the property of Ellis. Nothing was said directly as to the ownership of the "wraparound" although the court did tell the jury that "the Plaintiff consented to a *reduction in the value of his collateral* from $200,000 to $160,000. . . ." (Emphasis supplied.) Implicit in that comment is the clear inference that the $160,000 wraparound deed of trust was collateral for Wolman's indebtedness to Ellis.

The "wraparound deed of trust," however, was never assigned to Ellis or to the Bank, so that, on its face, it still belongs to Wolman. The $160,000 promissory note for which the "wraparound deed of trust" was given as security was, as we have previously stated, endorsed by Wolman to "the order of Freestate [*sic*] Bank to be held as collateral and for collection." The note was not endorsed to Ellis. Of equal, if not more importance, however, is that the note may be the property of another, namely, the *amici,* Mr. and Mrs. Buete.

We observe that the jury was never presented with the question of who owned the collateral. Had that been an issue in the case, then the Buetes would have been necessary parties. What has happened is that the Buetes, who claim ownership of the note, have had that claim effectively eradicated by the court's order of May 15, 1979.

Ellis's post-trial motion was, in the words of *Millison v. Clarke,* 32 Md. App. 140, 359 A.2d 127, *cert. denied,* 278 Md. 728 (1976), an attempt to seek an additur to the jury's verdict. Maryland has not joined those jurisdictions that permit additur. Generally, additur is available in much the same way as remittitur, although at opposite ends of the spectrum, that is, as a condition that unless agreed to, the court will order a new trial.

The procedure employed in the case *sub judice,* appears to be, at least in this State, without precedent. While that factor would not *per se* negate it, we must vacate the order on the

ground that the trial court was without authority to enter the post-trial order, adjudging the property rights of not only the parties to this appeal but also others not parties.

*Judgment affirmed.*
*Order of May 15, 1979 vacated.*
*Costs to be divided equally between the appellant and the appellee.*