REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 40

September Term, 2014

---

ROBERT ROMAN

v.

SAGE TITLE GROUP, LLC

---

Woodward,
Berger,
Friedman,

JJ.

---

Opinion by Woodward, J.

---

Filed: September 27, 2016

*Judge Kathryn G. Graeff and Judge Kevin F. Arthur did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

This appeal arises from the Circuit Court for Baltimore County, where appellant, Robert Roman, filed claims for conversion and negligence against appellee, Sage Title Group, LLC ("Sage Title"). Roman is a bridge lender, providing "interest-only" loans to real estate developers to finance acquisition, construction, and renovation of properties that are to be sold or refinanced. Sage Title is a real estate title company that conducts residential and commercial closings. In his complaint, Roman alleged that Kevin Sniffen, Sage Title's branch manager for the Baltimore City office, converted $2,420,000 of Roman's funds that had been deposited into Sage Title's escrow account to facilitate financing for two real estate projects. Roman alleged that Sage Title was vicariously liable for Sniffen's conversion, and that Sage Title was directly negligent in allowing Sniffen to disburse Roman's funds, held in escrow, without Roman's permission.

After a three-day jury trial, the circuit court granted Sage Title's motion for judgment on the negligence claim on the grounds that expert testimony was required to establish Sage Title's standard of care. The court allowed the conversion claim to go to the jury, which found in favor of Roman in the amount of $2,420,000. Following the jury verdict, Sage Title filed a motion for judgment notwithstanding the verdict ("JNOV"), which the court granted on the grounds that the allegedly converted funds were commingled with other funds in Sage Title's escrow account, and thus the conversion claim was barred as a matter of law.

On appeal, Roman presents two questions for our review, which we have slightly rephrased:

1.  Did the trial court err in granting Sage Title's motion for JNOV on Roman's conversion claim?

2.  Did the trial court err in granting Sage Title's motion for judgment on Roman's negligence claim where the trial court determined that expert testimony was required to prove Sage Title's negligence?

For the reasons set forth below, we answer the first question in the affirmative and the second question in the negative, thus reversing in part and affirming in part the judgment of the circuit court.

## **BACKGROUND**

The background for this case is set forth in the background section of the circuit court's Memorandum Opinion and Order:

> On April 3, 2009, [Roman] testified that he met with Mr. Brian McCloskey, a builder, Mr. Kevin Sniffen, a branch manager at [Sage Title's] Baltimore City office, and Patrick Belzner, to discuss an alleged false escrow scheme. With respect to this scheme, [Roman] would place his money in [Sage Title's] escrow account for the purpose of showing liquidity in order for Mr. McCloskey to obtain construction loans on two properties. [Roman] was led to believe that the money he deposited into [Sage Title's] escrow account would remain his, and it was not at risk because he was the only individual who would have access to it. Mr. Sniffen, [Sage Title's] employee, was the approved person and lawyer to handle all of these transactions. [Roman] then deposited a total of two million four hundred and twenty thousand dollars ($2,420,000.00) into [Sage Title's] escrow account. A short time later, Mr. Sniffen disbursed the funds pursuant to Mr. McCloskey's instructions. Mr. Sniffen was later fired by [Sage Title] on May 26, 2009 when he accepted two personal checks, which was against [Sage Title's] policy. In February 2012, Mr. Sniffen pled guilty to wire fraud or conspiracy to commit wire fraud and he was also disbarred.
>
> [Roman] filed his Complaint in this matter on January 26, 2012, alleging three claims: (1) Conversion and Theft; (2)

Negligence; and (3) Accounting. [Sage Title] then filed its Answer on March 14, 2012. Subsequently, [Sage Title] filed a Motion for Summary Judgment on August 28, 2012, with [Roman] filing [his] Opposition on September 24, 2012. [Sage Title's] Motion was later denied by the Court on October 17, 2012. After the Court's ruling, [Sage Title] filed a Motion for Reconsideration regarding the Court's Summary Judgment ruling. [Roman] filed [his] Opposition on November 14, 2012. Similar to [Sage Title's] Motion for Summary Judgment, the Court denied [Sage Title's] Motion for Reconsideration on January 17, 2013.

[Roman's] case then proceeded to a jury trial on August 6, 2013. At the beginning of trial, Roman dismissed all his claims with prejudice against the other Defendant in this case, Covenant Title Corp. [Roman] also informed the Court that he would not be pursuing his Accounting claim. At the end of [Roman's] case on August 7, 2013, [Sage Title] made a Motion for Judgment, which the Court reserved on. Subsequently, on August 8, 2013, at the close of [Sage Title's] case, [Sage Title] renewed its Motion for Judgment. The Court granted [Sage Title's] Motion with respect to the Negligence claim, but denied the Motion with respect to the Conversion claim. The trial concluded on August 8, 2013, with the jury finding in favor of [Roman] in the amount of two million four-hundred and twenty thousand dollars ($2,420,000.00).

[Sage Title] next filed [a] Motion for JNOV and Conditional Motion for New Trial on August 19, 2013, with [Roman] filing [his] Opposition on August 30, 2013. [Sage Title] subsequently filed a Reply on September 10, 2013, and later, an Amended Memorandum of Grounds and Authorities in Support of its Motions on September 3, 2013 [sic]. [Roman] then filed an Amended Memorandum of Grounds and Authorities in Support of its Opposition on September 11, 2013. The Court then held a hearing on October 11, 2013 on the Motions.

(Footnotes omitted).

The trial court entered its Memorandum Opinion and Order on February 28, 2014, granting Sage Title's JNOV motion on the grounds that Roman's money was commingled with other money in Sage Title's escrow account, and thus Roman "cannot bring a

conversion claim." As a result, the court vacated the judgment in favor of Roman and ordered that judgment be entered in favor of Sage Title. Roman filed his notice of appeal on March 21, 2014. Additional facts will be set forth below as necessary to resolve the questions presented.

## STANDARD OF REVIEW

Maryland Rules 2-519 and 2-532 govern motions for judgment and JNOV, respectively. The standard for reviewing the grant of a motion for judgment under Rule 2-519 is the same for reviewing the grant of a JNOV motion under Rule 2-532: we review the grant of both motions *de novo*. *UBS Fin. Servs., Inc. v. Thompson*, 217 Md. App. 500, 514 (2014), *aff'd*, 443 Md. 47 (2015). In doing so, we view the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party, and, uphold the grant of the motion "only when the evidence and permissible inferences permit only one conclusion with regard to the ultimate legal issue." *See Kleban v. Eghrari-Sabet*, 174 Md. App. 60, 86 (2007).

## DISCUSSION

### I. Conversion

Roman argues that the trial court erred in granting Sage Title's JNOV motion on the conversion claim, because the jury was presented with sufficient evidence to support the verdict in Roman's favor. According to Roman, the monies at issue in this case were "sufficiently identifiable" to allow the conversion claim to proceed, because the monies were held in Sage Title's escrow account for a particular purpose, and Sage Title's detailed records kept track of the escrow account's deposits and disbursements. Roman claims

4

that, because funds in escrow accounts "belong to the funds' original owners," even if such accounts include other funds, that money is sufficiently segregated and identifiable to allow for a conversion claim, given escrow account rules. According to Roman, even though no Maryland decision "squarely addresses the conversion of money" held in escrow, this Court should look to the Court of Appeals's language referring to the "conversion" of clients' funds held in attorneys' escrow accounts in a variety of attorney grievance cases. Roman also urges this Court to look at cases in other jurisdictions where courts have allowed conversion claims for money that is used for a specific purpose.

Roman next claims that, even if his funds were commingled with other funds, his conversion claim is valid, because his money should have been segregated in a separate escrow account, and thus the conversion occurred *before* the funds were commingled. Roman concludes that a defendant in a conversion claim should not be able to "skirt liability with a 'commingling' defense if that defendant was the cause of the money being wrongfully commingled in the first place."[1]

Sage Title responds that the trial court correctly granted its JNOV motion on the conversion claim, because commingled funds cannot be the subject of conversion. Sage Title claims that, although there is an exception for "*specific* segregated or identifiable funds," such exception is narrow and not applicable when the monies are commingled with other funds. According to Sage Title, the monies in question here were "doubly

---

[1] We need not, and do not, address this additional argument, because we decide the question presented in Roman's favor on the first ground that he argues.

commingled," because they were commingled with other funds from the same projects, as well as with the funds for all of Sage Title's Baltimore clients. Sage Title disputes Roman's reliance on the attorney grievance cases, because those cases, (1) "interpret Maryland Rules of Professional Conduct, not the common law of conversion," and (2) concern attorney escrow accounts, which have particular rules that do not apply to Sage Title's escrow account. Sage Title concludes that the trial court's decision comports with the purpose of the rule against conversion claims for commingled funds, because given the number of transfers and loan agreements between Roman and McCloskey for this project, the money at issue here is difficult to track.

"Conversion evolved from trover, which occurred where a defendant, a 'finder of lost goods[,] . . . refused to return them' to the plaintiff, the owner of the goods." *Thompson v. UBS Fin. Servs.*, 443 Md. 47, 56 (2015) (alterations in original) (quoting *Lawson v. Commonwealth Land Title Ins. Co.*, 69 Md. App. 476, 480 (1986)). "[T]he action and the tort have expanded beyond the case of lost goods and cover now nearly any wrongful exercise of dominion by one person over the personal property of another . . . ." *Lawson*, 69 Md. App. at 480. Historically, the tort of conversion was limited to tangible property, but over the years has been broadened to include intangible property, so long as "the defendant converts a document that embodies the plaintiff's right to the plaintiff's intangible property," such as a "stock certificate, a promissory note, or a document that embodies the right to a life insurance policy." *Thompson*, 443 Md. at 57 (citations omitted).

With respect to money, the Court of Appeals has stated that "[t]he general rule is

that monies are intangible and, therefore, not subject to a claim for conversion." *Allied Investment Corp. v. Jasen* 354 Md. 547, 560, 564 (1999). One reason for the rule is that money is often commingled: "if a defendant maintains possession of the proceeds in question, but commingles it with other monies, the cash loses its specific identity," and thus would be considered intangible property. *Id*. at 566. Furthermore, a conversion action "is not maintainable for money unless there be an obligation on the part of the defendant to return the specific money entrusted to his care"; otherwise, there is "only a relationship of debtor or creditor," and a conversion action "will not lie against the debtor." *Lawson*, 69 Md. App. at 482 (citations and internal quotation marks omitted).

In *Jasen*, the Court of Appeals also explained that there is an exception to the general rule that money is not subject to a conversion claim:

> **An exception exists, however, when a plaintiff can allege that the defendant converted specific segregated or identifiable funds.** This rule is well-synthesized in 1 Fowler V. Harper et al., *The Law of Torts*, § 2.13, at 2:56 (3d ed. 1986), which notes that **conversion claims generally are "recognized in connection with funds that have been or should have been segregated for a particular purpose or that have been wrongfully obtained or retained or diverted in an identifiable transaction."**

354 Md. at 564-65 (emphasis added) (citations and internal quotation marks omitted). Thus, according to the Court, money can be subject to a claim for conversion if "a plaintiff can allege that the defendant converted specific segregated or identifiable funds." *Id.* at 564.

Since *Jasen*, this Court has had occasion to consider a claim of conversion of money in a variety of contexts. In *Lasater v. Guttman*, Lasater brought suit against her husband,

7

alleging that he had converted "specific, segregated, identifiable separate funds" from the couple's joint checking account, maintained for household expenses, and spent these funds "on personal adventures, exotic merchandise and ill-advised real estate projects." 194 Md. App. 431, 447 (2010). We held that the wife's claim was precluded, because the wife did not point to specific amounts that she deposited, nor did she assert that the husband spent specific funds on non-household expenses. *Id.* at 447-48. We held that "once these monies were commingled with the couple's joint funds, they lost their separateness for purpose of a conversion claim[,]" and "[f]or this reason alone," the wife's conversion claim failed. *Id.*

In *George Wasserman & Janice Wasserman Goldstein Family LLC v. Kay*, real estate investors brought a conversion claim against Jack Kay, the managing partner and managing member of various real estate investment partnerships and limited liability companies ("LLCs"), alleging that Kay unlawfully transferred investment funds to another LLC. 197 Md. App. 586, 592, 597 (2011). According to the investors, the operating agreements of the LLCs "contained explicit requirements for company funds to be kept in a bank account or a savings and loan account and to be either distributed to members, or continued to be held as reserve funds[,]"and the partnerships had "either [] a written provision for the safe-keeping and distribution or reserve of partnership funds substantially identical to those of the [] LLCs." *Id.* at 597 (internal quotations omitted). We held that the conversion claim could not stand, because the funds allegedly converted were not "specific, segregated, or identifiable funds." *Id.* at 632.

8

Similarly, in *John B. Parsons Home, LLC v. John B. Parsons Foundation*, we held that a conversion claim was not available, because the subject monies were commingled with other funds. 217 Md. App. 39, 61-62 (2014). We noted that the plaintiff never alleged that the monies at issue were "specific, segregated or identifiable funds," nor was there an allegation that the funds "were not subsequently commingled." *Id*. at 61. Because approximately nine years passed between the commencement of the distribution payments and the lawsuit, we affirmed the circuit court's ruling that the passage of time "inevitably resulted in the commingling of funds." *Id*. at 62.

In sum, money that is commingled with other funds "loses its specific identity[,]" and thus there can be no claim for conversion. *Jasen*, 354 Md. at 566; *see also John B. Parsons Home, LLC*, 217 Md. App. at 61. In cases where Maryland courts have precluded claims for conversion of funds on the basis that the funds were commingled, the plaintiff either never identified a specific dollar amount that was allegedly converted, or the defendant had no obligation to return those funds in the first place. *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 258 n.3 (2004) ("Darcars *did not have an obligation to return* the specific bills used for the down-payment." (emphasis added)); *Jasen*, 354 Md. at 566-67 ("The facts do not allege that [Jasen] received *any identifiable dollar amount* of profits, assets, distributions, dividends, or other monetary award . . . ." (emphasis added)); *John B. Parsons Home, LLC*, 217 Md. App. at 61-62 ("[T]he Foundation *failed to allege* . . . that the distribution payments were ever '*specific, segregated or identifiable funds*.'" (emphasis added)); *Wasserman*, 197 Md. App. at 632 ("One cannot convert monies unless the monies alleged to have been converted are

9

'*specific, segregated, or identifiable funds,*' *and the funds allegedly converted in this case do not meet that test.*" (emphasis added)); *Lasater*, 194 Md. App. at 447 ("[Lasater] *does not maintain that these specific funds* then were spent by Guttmann on non-household expenses or that they otherwise *were wrongfully converted*." (emphasis added)); *Lawson*, 69 Md. App. at 483 (noting that *no "specific assets or the proceeds of a specific account . . . were wrongfully taken*" (emphasis added)).

No Maryland appellate opinion, however, has dealt with a claim of conversion of money placed in an escrow account. Looking outside of Maryland for cases dealing with escrow accounts, several jurisdictions have allowed conversion claims where the subject of conversion was money that by agreement of the parties was to be placed in escrow, even if the money was commingled with other funds or not placed in escrow at all. In *Addie v. Kjaer*, the buyers agreed to purchase two parcels of land from the sellers, and as a part of the purchase agreement, the buyers were to pay $1.5 million into an escrow account. 51 V.I. 463, 467-68 (D.V.I. 2009). When the purchase of the parcels was not completed, "[t]he Buyers demanded the return of the Escrow Money. The Escrow Money was not returned. This action ensued." *Id.* at 468. One of the buyers' claims was for conversion against Kevin D'Amour, the president of the title company that managed the escrow account. *Id*. at 467-68.

First, the U.S. District Court summarized the claim for conversion of money as it applied to escrowed funds:

> An escrow account is "[a] bank account, generally held in the name of the depositor and an escrow agent, that is returnable to the depositor or paid to a third person on the fulfillment of specified

10

conditions." Black's Law Dictionary (8th ed. 2004). **Escrow is "property delivered by a promisor to a third party to be held by the third party for a given amount of time or until the occurrence of a condition, at which time the third party is to hand over the . . . property to the promisee."** *Id.* **Until the occurrence of such a condition, legal title to the property remains in the depositor.** *In re Mushroom Transp. Co.*, 382 F.3d 325, 338 n.9 (3d Cir. 2004) (citation omitted; applying Pennsylvania law).

"[E]scrow agents owe their depositors a fiduciary duty to disburse the deposits according to the terms of the escrow agreement." *Trw Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 829 (7th Cir. 1998) (citation omitted); *see also John Deere Co. v. Walker*, 764 F.Supp. 147, 152 (D. Ariz. 1991) ("[T]he duties of the escrow agent are defined by the written instructions given to the escrow agent.") (citations omitted). **Thus, "an escrow agent may be guilty of conversion if it violates the escrow agreement, exercises ownership without authorization, or acts in some other way that is inconsistent with its express duties under the contract."** *Eckholt v. American Business Info.*, 873 F. Supp. 521, 523 (D. Kan. 1994) (applying Kansas law; citation omitted); *see also* 28 Am. Jur. 2d Escrow § 30 ("Since the depositary is bound by the terms of the deposit and charged with the duties voluntarily assumed by him or her, liability attaches to him or her for failing to follow his or her instructions, whether done deliberately or negligently.") (footnotes omitted).

*Id.* at 474-75 (emphasis added). The Court then held that, "[b]ecause D'Amour personally released the Escrow Money in contravention of the express conditions of the Escrow Agreement, . . . the Buyers have met their initial burden of showing that D'Amour converted the Escrow Money." *Id*. at 479-80.

Similarly, in *Amusement Industry, Inc. v. Stern*, the U.S. District Court for the Southern District of New York determined that the plaintiffs stated a viable claim for conversion under New York state law, because the plaintiffs alleged that (1) they placed the funds into escrow pursuant to an escrow agreement; (2) they "did not give authority for

11

the money to be released"; (3) the defendants moved the money to another account; and (4) the defendants used the money for an unauthorized purpose. 786 F. Supp. 2d 758, 782-83 (S.D.N.Y. 2011). The District Court concluded that the conversion claim was proper, because the plaintiffs "had a possessory interest in the [funds] and the defendants took control of [those funds] without [the plaintiff's] permission." *Id*. at 783. The District Court determined that the defendants' argument that the funds were not sufficiently identifiable because they were commingled was without merit, because the plaintiffs sought "the return of the specifically identified [funds] the plaintiffs placed in escrow, which was only to be released if [the plaintiffs] gave [the] defendants the authority to do so." *Id.*; *see also Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1195-96 (Colo. App. 2008) (holding that the plaintiff established the elements for a conversion claim by alleging that the defendant wrongfully commingled money that should have been placed in an escrow account "'thereby taking dominion over the funds,' which was underscored when [the plaintiff's] requests for the return of its money were refused" by the defendant); *Grand Pacific Fin. Corp. v. Brauer*, 783 N.E.2d 849, 857 (Mass. App. 2003) (holding that an attorney and his firm were liable for conversion of funds that a lender had deposited into the law firm's escrow account, because "an escrow holder's unauthorized collection from escrowed funds of a debt owed by a party to the escrow agreement[] would be a breach of duty") (citation and internal quotation marks omitted); *Goodwin v. Alexatos*, 584 So. 2d 1007, 1011 (Fla. App. 1991) (summarizing caselaw allowing for a conversion claim where "a lawyer wrongfully retained in his trust account money belonging to his client," or "where money is wrongfully withdrawn from a bank account").

12

In the case *sub judice*, we view the evidence in a light most favorable to Roman as the non-moving party in Sage Title's motion for JNOV. *See Kleban*, 174 Md. App. at 86. Here, Roman's funds were placed into an escrow account at Sage Title. Roman identified $2,420,000 as the sum of three discrete payments by cashier's checks: (1) a check for $1,500,000, dated April 13, 2009; (2) a check for $220,000, dated April 20, 2009; and (3) a check for $700,000, dated April 30, 2009. Roman admitted into evidence copies of these checks, as well as their corresponding notations on Sage Title's balance sheets. The $1,500,000 check was identified as a deposit for McCloskey's property located at 1100 Columbia Ave, York, PA, and the other two checks were identified as deposits for McCloskey's property located at Claires Lane, Baltimore, MD.

At their meeting on April 3, 2009, Sniffen, McCloskey, Belzner, and Roman agreed that the aforementioned funds placed by Roman into Sage Title's escrow account would still belong to Roman and would be returned to him when the construction loan was secured. Also, Roman would be the only person who would have access to his funds in the Sage Title escrow account.

Michael Maddox, President of Sage Title, testified in his deposition that the escrow account was different from Sage Title's operating account, with the escrow account housing other people's money, while the operating account paid Sage Title's rent, mortgage, employees, and other expenses. Maddox testified further that Sage Title had one escrow account for each of Sage Title's offices, with all of the funds of every transaction going through that office placed in that office's one escrow account.

13

Maddox, however, testified that Sage Title accounted separately for each property by generating "single ledger balance reports" showing the transactions for each property. Thus the single ledger balance report identified Roman's checks totaling $2,420,000 by reference/check number, the transaction date, the payee name and memo, the medium, the cleared date, and the amount. The ledger balance report also identified money contributed by other persons or entities to the two properties at issue.

Sniffen and Sage Title admitted that all of Roman's funds were disbursed by the end of May 2009, when the Sage Title Escrow account for the two properties was completely emptied, and that Roman's $2,420,000 was never returned to him.

Based on these facts, we conclude that, although Roman's monies were placed with other funds in Sage Title's escrow account, the $2,420,000 deposited to that escrow account was sufficiently specific, segregated, and identifiable to support a claim for conversion. Roman identified the specific funds at issue through the three checks and the corresponding notations on Sage Title's ledger balance reports. In other words, Roman was able to "describe the funds with such reasonable certainty that the jury may know what money is meant." *Jasen*, 354 Md. at 565. The funds were segregated because, by agreement, the funds were to be placed in an escrow account, belong to Roman, be accessible only by Roman, and be returned to Roman. Finally, the funds were sufficiently identifiable, because all of Roman's monies were not returned by Sniffen to Roman, nor were they disbursed with Roman's permission. As a result, the *Jasen* test is met, and Roman's monies are the subject of a claim for conversion. *See* 354 Md. at 564-65.

14

Nevertheless, Sage Title argues that, even though the funds were in an escrow account, those funds were commingled, because they were placed into an account with other funds belonging to other persons or entities. According to Sage Title, such commingling precludes a conversion claim for Roman's funds. At oral argument before this Court, when asked if the presence of any other funds in the escrow account prevented Roman's funds from being the subject of a claim for conversion, Sage Title answered in the affirmative. We believe that such view of commingling of funds is too broad.

"Commingling of funds" is defined as an "[a]ct of fiduciary in mingling funds of his [or her] beneficiary, client, employer, or ward with his [or her] own funds." *Commingling of funds*, Black's Law Dictionary (6th ed. 1990).[2] Commingling of funds, in our view, does *not* occur when funds are placed in an escrow account to be disbursed only by agreement, even if those funds are physically located in the same account with other funds. In other words, if the funds, although physically mixed with other funds in an escrow account, are still under the control of the owner or restricted in use by agreement with the owner, commingling of such funds does not occur. Again, as the Court stated in *Addie*,

> [e]scrow is property delivered by a promisor to a third party to be
> held by the third party for a given amount of time or until the
> occurrence of a condition, at which time the third party is to hand
> over the . . . property to the promisee. Until the occurrence of such
> a condition, legal title to the property remains in the depositor.

---

[2] Similarly, in the tenth edition of Black's Law Dictionary, "commingling" is defined as "[a] mixing together; esp., a fiduciary's mixing of personal funds with those of a beneficiary or client." *Commingling*, Black's Law Dictionary (10th ed. 2014).

15

51 V.I. at 474-75 (citations and internal quotation marks omitted).[3]

Similarly, in the attorney grievance context, the Court of Appeals has characterized as "conversion" an attorney's wrongful conduct in diverting a client's funds from the attorney's escrow account, where all clients' funds are placed. *See, e.g., Attorney Grievance Comm'n v. Cherry-Mahoi*, 388 Md. 124, 135-36 (2005); *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 500 (2002); *Attorney Grievance Comm'n v. Spery*, 371 Md. 560, 571 (2002). We recognize that in those cases, the Court was not deciding whether the elements of the tort of conversion had been established. These cases are analogous, however, because the attorney placed various clients' funds in a single escrow account, but maintained separate ledgers to track the funds associated with each account; and the attorney had a duty to follow the client's directions with regard to disbursing the funds. *See generally* Md. Rule 16-601 *et seq.* To summarize, we will not bar a conversion claim simply because funds were located in a single escrow account, without looking at the purpose of the account, the duties of the account holder, and whether the funds were sufficiently specific, separate, and identifiable.

## II. Conversion: Sage Title's Alternate Grounds

As stated earlier, the trial court granted Sage Title's JNOV motion, vacating the jury's verdict in favor of Roman. Sage Title argues that the trial court's JNOV can be

---

[3] Furthermore, regardless of the transfers in and out of the escrow account for McCloskey's properties, Sniffen and Sage Title conceded at trial that *all* of the money in the accounts for both properties was disbursed. As a result, there is no issue of determining which funds were converted and which remained in the escrow account.

16

affirmed on alternative grounds. Specifically, Sage Title claims that it cannot be vicariously liable for Sniffen's conversion, because Sniffen's criminal acts were outside of the scope of his employment, did not benefit Sage Title, and were not foreseeable. Sage Title also claims that Roman's own conduct bars his conversion claim under the unclean hands/*in pari delicto* doctrine.

In his reply brief, Roman responds that the trial court correctly determined that Sage Title waived its *respondeat superior* claim "because it failed to raise any argument regarding the foreseeability of Sniffen's conduct[,]" a fact that Roman says that Sage Title conceded. If the *respondeat superior* claim is not waived, Roman claims that sufficient evidence existed to present the claim to the jury, because (1) there was evidence that Sniffen's conduct of disbursing funds from the Sage Title escrow account served Sage Title's interest and was authorized; and (2) Sniffen's conduct was foreseeable, because Sage Title knew that Sniffen previously had violated Sage Title policy by accepting personal checks.

As for Sage Title's unclean hands/*in pari delicto* claim, Roman argues that this claim is not preserved, because Sage Title did not raise it during its motion for judgment at the close of all the evidence. Even if this claim is preserved, Roman asserts that Sage Title must show that Roman "actual[ly] participat[ed] in fraudulent or illegal conduct" to invoke the *in pari delicto* defense, and such participation is not supported by any evidence of a scheme to defraud lenders.

Rule 2-532(a) states that "a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence *and*

17

*only on the grounds advanced in support of the earlier motion.*" *Id.* (emphasis added).

Rule 2-519(a) states that a party, in making a motion for judgment, "shall state with particularity all reasons why the motion should be granted." *Id.* We have articulated the purpose of the "particularity requirement":

> This requirement has important and salutary purposes. It implements, on the one hand, a principle of basic fairness. A trial judge must be given a reasonable opportunity to consider all legal and evidentiary arguments in deciding what issues to submit to the jury and in framing proper instructions to the jury. The other parties must have a fair opportunity at the trial level to respond to legal and evidentiary challenges in order (1) to make their own record on those issues and (2) to devise alternative trial strategies and arguments should the court grant the motion, in whole or in part. Allowing these issues to be presented for the first time on appeal is also jurisprudentially unsound, for it may well result in requiring a full new trial that otherwise might have been avoided.

*Kent Vill. Assocs. Joint Venture v. Smith*, 104 Md. App. 507, 517 (1995). This Court has held that "upon 'renewal' of a motion for judgment at the close of all the evidence, reference to a memorandum, previously submitted to the court, which sets forth with particularity the arguments in support of the motion is sufficient compliance with Maryland Rule 2-519(a)." *Laubach v. Franklin Square Hosp.*, 79 Md. App. 203, 216 (1989), *aff'd*, 318 Md. 615 (1990).

### A. Scope of Employment

As an initial matter, we agree with Sage Title that it preserved its scope of employment challenge. In its written Motion for Judgment, Sage Title argued that Sage Title was not vicariously liable for Sniffen's alleged conversion under a theory of *respondeat superior*. According to Sage Title, the alleged conversion was not committed

18

within the scope of Sniffen's employment, because (1) he violated company policy, industry standards, and the law; and (2) his "actions would not have been related to" Sage Title's business. Sage Title incorporated its written motion into its oral motion for judgment at the close of Roman's case on August 7, 2013. The court reserved on Sage Title's motion for judgment, which Sage Title renewed at the close of its own case on August 8, 2013. In its memorandum in support of its JNOV motion, Sage Title, reiterated the scope of employment argument when it argued that "the touchstones of *respondeat superior* as a basis for liability are the foreseeability of the employee's misconduct, coupled with necessity that the misconduct serve some interest of the employer." Because Sage Title raised the issue of whether Sniffen's conduct fell within the scope of his employment in its motion for judgment at the close of all the evidence and in its JNOV motion, the issue is preserved under Rules 2-519(a) and 2-532(a).

Turning to the merits, however, we agree with Roman that sufficient evidence existed to present the *respondeat superior* question to the jury. The Court of Appeals has stated that

> for an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer. Ordinarily, the issue of whether a particular act is within the scope of employment is properly decided by a jury[][;] however, where there is no conflict in the evidence relating to the question and but one inference can be drawn therefrom, the question is one of law for the court.

*Barclay v. Briscoe*, 427 Md. 270, 283 (2012) (citations and internal quotation marks omitted). Regarding a forbidden or criminal act, "[t]he general rule is that an employer

19

cannot be held liable for the criminal acts of an employee, unless they were committed during the course of employment and to further a purpose or interest, however excessive or misguided, of the employer." *Fearnow v. Chesapeake & Potomac Telephone Co. of Md.*, 104 Md. App. 1, 51 (1995) (citations omitted), *rev'd in part on other grounds*, 342 Md. 363 (1996).

In the case *sub judice*, Maddox testified that Sniffen was hired "to generate business, process the business that he brought in, conduct settlements, oversee closings[, and] oversee a staff for the office," and that Sniffen was "authorized to take deposits . . . and put them into the escrow account . . . [and] sign checks and make disbursements from the escrow account." Regarding the placement of Roman's monies in Sage Title's escrow account, Sniffen "was the approved person, lawyer, title person, together with Sage Title, to handle these transactions."

Susan Holler, the executive vice president of Sage Title, testified that Sniffen violated Sage Title policy by accepting for deposit personal, uncertified checks in "late March or early April," before the April 3, 2009 meeting between Roman, McCloskey, Belzner, and Sniffen. Maddox testified that he terminated Sniffen on May 26, 2009, after Sniffen again accepted personal checks and overdrew the Sage Title escrow account, in violation of Sage Title's policy. Maddox conceded that the single ledger balance report for one of the McCloskey's properties documented Sage Title Group, LLC Settlement Agents Fees in the amount of $850.00. Finally, the trial court submitted the issue of Sniffen's scope of employment to the jury with instructions on *respondeat superior*, scope of employment, and *respondeat superior* for intentional torts. *See* Md. Civil Pattern Jury

20

Instructions 3:3–3:5 (4th ed. 2013).

Because Sniffen was authorized to receive and disburse funds from the Sage Title escrow account in order to conduct Sage Title's business, including the receipt and disbursement of Roman's funds, and Sage Title earned closing fees on the projects in question, we conclude that a reasonable jury could find that Sniffen's misconduct—disbursing Roman's funds pursuant to McCloskey's instructions, instead of returning the funds to Roman per their agreement—was in "furtherance of the employer's business and authorized by the employer." *Barclay*, 427 Md. at 283 (citations omitted). Sniffen's misconduct was also foreseeable, because Sage Title had knowledge that Sniffen had previously violated Sage Title's policy by accepting personal checks, and, as articulated by the trial court, Sage Title "was therefore put on notice that [] Sniffen may be engaging in questionable conduct." Accordingly, the trial court did not err in holding that the issue of Sniffen's scope of employment was a jury question. *See id.* (stating that there is no "one inference [that] can be drawn" from the evidence that would make the scope of employment a question of law (citations omitted)).

### B. Unclean Hands/In Pari Delicto

Sage Title argues that Roman's conversion claim is barred by the doctrine of unclean hands/*in pari delicto*, because Roman was aware that there was a false escrow scheme and that "McCloskey would be falsely representing to lenders that the money in [Sage Title's] escrow account was his" money. The circuit court determined that Sage Title waived this argument, because Sage Title "failed to present it during its motion for judgment." The court explained:

21

[I]n its written motion, [Sage Title] presented the argument that [Roman's] claim was barred by the doctrine of "unclean hands," on the grounds that he would not have had any damages if he gave [Sage Title] *closing instructions or had insisted on some restrictions as to the use of his money*. [Sage Title] did not present the instant argument that [Roman] was aware of the false escrow scheme and that Mr. McCloskey would be falsely representing to lenders that the money in [Sage Title's] escrow account was his.

Moreover, this precise argument was not made during [Sage Title's] oral Motion. . . .

Finally, [Sage Title] then renewed its motion at the close of all evidence, but did not provide any additional argument on the issue of unclean hands or *in pari delicto*.

In sum, the specific ground that [Sage Title] now presents with respect to this defense was not presented in its written motion and during its oral motion, as required by Rule 2-532(a). By failing to present this argument, the purpose of the particularity requirement of Rule 2-519 is not fulfilled. [Sage Title] presented to the Court in its motion for judgment that [Roman] had unclean hands, because he was essentially negligent and did not have instructions on his money or involve his lawyer. However, the Court was not presented with the argument that [Roman] was aware of the fraudulent nature of the scheme, which therefore prevented the Court from evaluating this specific argument. As a result, the Court finds that [Sage Title] waived this argument.

(Emphasis in original) (footnotes omitted).

We agree with the trial court that Sage Title waived its unclean hands/*in pari delicto* defense, because the grounds for this defense in Sage Title's JNOV motion were distinct from its grounds for this defense in its motion for judgment. Because a party may only base its JNOV motion on grounds that were advanced in support of its earlier motion for judgment, we hold that Sage Title waived its unclean hands/*in pari delicto* defense. *See* Md. Rule 2-532(a).

### III. Negligence: Expert Testimony

Finally, Roman argues that the trial court erred in granting Sage Title's motion for judgment on Roman's negligence claim because of a lack of expert testimony to establish Sage Title's standard of care. Roman asserts that "an unauthorized transfer of someone else's money is *so obviously negligent* that expert testimony is clearly not necessary to establish that." In addition, Roman claims that "Sage Title simply had <u>no policies</u>, <u>no procedures</u>, <u>no guidelines</u> and <u>no safeguards</u> in place to prevent the unauthorized disbursement of funds[,]" and thus expert testimony was unnecessary to establish that Sage Title "should have done *something* to safeguard the money" in its escrow account. (Emphasis in original).

Sage Title responds that the trial court properly granted judgment on Roman's negligence claim, because Roman did not designate an expert on the standard of care or identify any standard that would have prevented the loss. According to Sage Title, Roman was required "to present *affirmative* evidence of the standard of care, not speculation that the standard of care required Sage Title to adopt some unidentified standard for Roman's protection that would have prevented the loss." (Emphasis in original).

The Court of Appeals set forth the rules regarding expert testimony to establish a standard of care in *Jones v. State*:

> [W]here the plaintiff alleges negligence by a professional, expert testimony is generally necessary to establish the requisite standard of care owed by the professional. The rule, derived to a large degree from medical malpractice cases, is that experts are usually necessary to explain professional standards because such standards require specialized knowledge within the professional's field that are generally beyond the ken of the average layman. If

23

the plaintiff presents no expert when one is needed, then the trial court may rule, in its general power to pass upon the sufficiency of the evidence, that there is not sufficient evidence to go [to] the jury.

We have emphasized, though, that experts are not needed when the alleged negligence is so obvious that the trier of fact could easily recognize that such actions would violate the applicable standard of care. If a jury can use its common knowledge or experience to recognize a breach of a duty, then expert testimony is unnecessary to calibrate the exact standard of care owed by the defendant.

425 Md. 1, 26-27 (2012) (citations and internal quotation marks omitted).

Three Maryland cases that addressed the need for expert testimony in the context of a bank's standard of care are instructive to the case *sub judice*. In the first case, *Free State Bank & Trust Co. v. Ellis*, this Court held that expert testimony was not required to establish the bank's standard of care, because "the average juror would know without expert testimony that banks simply do not ordinarily do what [Free State Bank] did in this case." 45 Md. App. 159, 164 (1980), *cert. denied*, 288 Md. 374 (1980). Ellis had obtained a loan from Free State Bank for $300,000 after providing as collateral (1) a second mortgage on his home, and (2) a promissory note for $200,000, payable to Ellis by Wolman and secured by a second mortgage on Wolman's home. *Id*. at 160. When Wolman approached Ellis for a release of the promissory note so that he could sell his home, Ellis directed Wolman to "work it out with the Bank, and that anything they agreed to do would be all right with him so long as he remained secured." *Id*. at 160-61. Free State Bank accepted a "wraparound deed of trust" and promissory note for $160,000 as collateral for the loan to Ellis in place of the $200,000 collateral previously posted. *Id*. at 161. The new promissory note was payable to Wolman by the Palmers, the purchasers of Wolman's

24

home. *Id.* Wolman endorsed the Palmer note to Free State Bank "for collection." *Id.*

Thereafter, payments on the Palmer note were credited to Wolman's account at Free State

Bank. *Id.*

When he found out about the substitution of collateral, Ellis sued Free State Bank

for negligence, among other claims. *Id.* at 162. At trial, Ellis did not introduce expert

evidence (or any evidence at all) regarding the standard of care to which the Bank was

held. *Id.* The jury found for Ellis on the negligence count in the amount of $80,000. *Id.*

On appeal, we held:

> **Certainly, no expert testimony was needed to show that banks do not ordinarily release the collateral of a customer and take in substitution thereof a paper writing which is not collateral, and which does no more than allow the bank to collect monies due on the collateral and credit it to the account of another.** No expert testimony is needed to show the jurors that banks do not ordinarily release a deed of trust that secures a $200,000 promissory note payable to the bank's customer and which has been assigned to the bank as collateral for the customer's loan, and accept as substitute collateral a note secured by a deed of trust, payable to a party other than the bank's customer, and which is not even assigned to the bank, except, for all practical purposes, for collection. No expert testimony is needed to demonstrate to the jury that by doing what it did in the instant case, the Bank stripped its customer of his security for a $200,000 loan to another party.

*Id*. at 163 (emphasis added). We concluded by noting that, "even if expert testimony is

ordinarily needed to prove the standard of reasonable care used by banks in the community

in its dealings with its customers," no expert testimony was required to demonstrate Free

State's negligence under the facts at hand. *Id*. at 164.

We returned to the issue of expert testimony and a bank's standard of care in *Saxon*

*Mortgage Services, Inc. v. Harrison* where we held again that expert testimony was not

25

necessary under the facts of that case. 186 Md. App. 228, 291 (2009). The Joint Insurance Association had issued a check in the amount of $140,000 to Harrison and Saxon Mortgage Services (SMS), among other parties, after Harrison had submitted a property insurance claim. *Id*. at 236. The check was hand-delivered to Harrison, who apparently endorsed the check to the law firm of Dunlap Grubb Weaver and Whitbeck, P.C. ("the Dunlap firm"). *Id*. at 236-37. The Dunlap firm then endorsed the check for deposit to Middleburg Bank, where it was accepted. *Id*. The back of the check contained the following instruction above the indorsement line: "All Payees must endorse below exactly as written on the face of the check." *Id* at 290. Although SMS neither endorsed the check nor authorized any person to endorse the check on its behalf, the word "Saxon" was handwritten on the back of the check. *Id.*

SMS filed suit for conversion and negligence. *Id*. at 238. A bench trial was held, and the trial court granted Middleburg Bank's motion for judgment on the negligence claim on the grounds that SMS "failed to offer any evidence of banking industry standards through expert testimony." *Id*. at 234, 286-87. We reversed the judgment in favor of Middleburg Bank, because the instructions on the back of the check, as well as Middleburg Bank's own training guidelines, provided that a payee "should endorse its name exactly as it appears on the front of the check." *Id*. at 290. We noted that, "while a bank's own procedures cannot in and of themselves be equated with reasonable commercial standards, a bank's failure to follow its own normal procedures is indicative of a failure to act in accordance with reasonable commercial standards." *Id*. at 290 (quoting *Inventory Locator Serv., Inc. v. Dunn*, 776 S.W.2d 523, 526-27 (Tenn. Ct. App. 1989)). Accordingly, we

26

held that the issue of whether the bank violated a standard of care because it failed to follow its own procedures, as well as the check's express instructions, was not "so particularly related to some science or profession that is beyond the ken of the average lay[person,]" and thus expert testimony was not required. *Id*. at 290-91 (alteration in original) (citations and internal quotation marks omitted).

Finally, in *Schultz v. Bank of America*, the Court of Appeals held that expert testimony was required to establish a bank's standard of care when adding a customer to an account. 413 Md. 15, 27 (2010). Schultz, as personal representative of his father's estate, brought suit against Bank of America, alleging that the Bank acted negligently when it added Holbrook's name to Schultz's father's checking account and allowed her to withdraw funds from the account. *Id*. at 18-20. The Bank moved for judgment at the close of Schultz's case and at the close of all the evidence; the trial court denied both motions, and the jury found in favor of Schultz. *Id*. at 20.

On appeal, the Court noted that, although "expert testimony is generally necessary to establish the requisite standard of care owed by the professional[,]" such testimony is not needed when "the alleged negligence, if proven, would be so obviously shown that the trier of fact could recognize it without expert testimony." *Id*. at 28-29. The Court cited with approval this Court's holdings in *Saxon* and *Free State*, summarizing them as standing "for the proposition that expert testimony may sometimes be unnecessary" when a bank's negligence is obvious. *Id*. at 30-31. In a similar vein, the Court discussed *Taylor v. Equitable Trust Company*, 269 Md. 149 (1973). *Id.* at 31. The Court of Appeals observed that, although it had not addressed the necessity of expert testimony in *Taylor*,

27

such testimony "may not have even been necessary, due to the seemingly obvious nature of the bank's negligence. The Court explained that there was 'no doubt' the bank was negligent when it transferred funds without determining whether the transfer was authorized[,]" especially given the bank's testimony "that written instructions from the customer were 'customarily required' before making this sort of transfer." *Schultz*, 413 Md. at 31, 31-32 n.12 (citing *Taylor*, 269 Md. at 158).

The Court summarized Schultz's negligence claim as the Bank failing "to properly add Holbrook to the account" and to verify the identities of Holbrook and Schultz's father. *Schultz*, 413 Md. at 33. The Court held that expert testimony was required to establish the Bank's standard of care in such situation, because "we cannot say with any certainty that most people have added someone's name to their bank accounts[,]" and even if that were the case, "the relevant activity in this case was by the bank itself, not a bank customer." *Id*. at 34. The Court noted that the process of adding an individual to a bank account "may occur behind closed doors, out of the sight of the customer, and may involve numerous unknown procedures. To explain this process, a plaintiff must produce expert testimony from someone familiar with the process from a bank's perspective." *Id*. at 35. Finally, the Court stated that banking procedures are rapidly changing due to new technology, and thus "may not be the same today as they were just a few years ago, which also means that an expert may be necessary to explain to the trier of fact what duty a bank owes to a customer." *Id*. (footnote omitted).

In the case *sub judice*, Roman's negligence claim is based on his allegation that Sage Title negligently (1) "allow[ed] Sniffen to withdraw . . . Roman's Sage Title funds from the

28

Sage [Title escrow] account[,]" (2) "fail[ed] to institute proper procedures and safeguards to insure that its employees did not utilize funds entrusted to Sage [Title] for purposes other than" those agreed upon by Roman, and (3) "allow[ed Sniffen] . . . to remove trust funds in [Sage Title's] possession and control for any purpose without the consent of the person or entity who had deposited the funds with Sage [Title]."

We conclude that expert testimony was required to establish Sage Title's negligence, because most lay people are not familiar with the operation of escrow accounts, nor with any standard of care a title company owes to individuals or entities who are not customers, but who deposit funds in escrow with the title company. Similar to the facts in *Schultz*, Sage Title's procedures and safeguards would "occur behind closed doors, out of the sight of the customer, and may involve numerous unknown procedures" that are "beyond the ken of the average layperson." *See id*. at 30, 35 (quoting *Saxon*, 186 Md. App. at 290-91).

In *Saxon* and *Free State*, where expert testimony was "unnecessary for the trier of fact to appreciate a bank's duty to its customers . . . each bank committed an act that was so obviously negligent that the trier of fact could recognize that the bank had violated its duty to the plaintiffs without the aid of expert testimony." *Schultz*, 413 Md. at 30-31 (footnote omitted). Here, it was not "so obvious[]" that, when Sage Title disbursed the funds per the instructions of its customer, McCloskey, it was violating a duty it owed to Roman, who was not its customer. *See id*. at 29. The parties in this case also were sophisticated developers accustomed to working with title companies and multiple parties to move large sums of money in and out of escrow accounts; the standard of care for title companies in such circumstances is unknown to the average juror.

29

Lastly, Roman's argument that expert testimony is not required on the grounds that Sage Title had "<u>no</u> policies, <u>no</u> procedures, <u>no</u> guidelines and <u>no</u> safeguards in place" is without merit, because the jury still did not know whether the standard of care required Sage Title to have any policy at all. Expert testimony was required to show the need for such policies in the first place, as well as what those policies should provide. As a result, expert testimony was necessary to establish the duty that Sage Title owed to Roman, and the trial court did not err in granting Sage Title's motion for judgment on Roman's negligence claim.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**