*Sage Title Group, LLC v. Robert Roman*, No. 87, September Term, 2016. Opinion by Greene, J.

**TORT—CONVERSION—COMMINGLED MONEY—ESCROW ACCOUNT**

The Court of Appeals determined that monies held in an escrow account were not commingled with other funds held in that escrow account to defeat a claim for conversion because the funds were specifically identifiable. The Court of Appeals applied the rationale in *Allied Investment Corp. v. Jasen*, 354 Md. 547, 731 A.2d 957 (1999), which held that a conversion claim for money may survive when the funds have been or should have been segregated for a particular purpose or are specifically identifiable. The Court of Appeals concluded that Respondent's funds, in the amount of $2,420,000, were properly the subject of a conversion claim because the Petitioner title company's ledger report showed detailed entries for each specific deposit of the Petitioner's funds, thus precluding a claim of commingling, and because the total amount of funds were disbursed by the Petitioner title company's employee.

**CIVIL PROCEDURE—MOTION FOR JNOV—PRESERVATION OF CLAIM— *RESPONDEAT SUPERIOR***

The Court of Appeals held that when a defendant moved for judgment at the close of plaintiff's case and presented the theory of *respondeat superior* in a memorandum submitted in support of its motion for judgment, then the defendant renewed its Motion for Judgment at the close of the defendant's case, the issue of *respondeat superior* was preserved for purposes of a Motion for Judgment Notwithstanding the Verdict (JNOV). Because the trial court could identify the argument that was being made in support of the Motion for Judgment and the Motion for Judgment Notwithstanding the Verdict, the defendant properly preserved the *respondeat superior* claim.

**TORT—*RESPONDEAT SUPERIOR***

The Court of Appeals held that Petitioner title company was vicariously liable for the tort of conversion committed by its employee when the employee disbursed $2,420,000 from the title company's escrow account. The doctrine of *respondeat superior* is properly invoked if an employee's conduct is in furtherance of the employer's business and the conduct is authorized by the employer. Here, the employee, as branch manager of the title company, was authorized to deposit checks and disburse funds from the title company's escrow account and these acts were part of the employee's regular duties to further the title company's business. As to the issue of foreseeability of the employee's conduct, the Court of Appeals held that the conduct was foreseeable because the title company was on notice that the employee had previously violated the title company's policy of depositing uncertified, personal checks into the escrow account.

**CIVIL PROCEDURE—MOTION FOR JNOV—PRESERVATION OF CLAIM—UNCLEAN HANDS/*IN PARI DELICTO***

The Court of Appeals held that when a defendant raised the issue of unclean hands/ *in pari delicto* for the first time in its Motion for Judgment Notwithstanding the Verdict, the party waived the issue for consideration by the trial court. The Maryland Rules are "precise rubrics" which must be followed. Failure to present the issue in a motion for judgment precludes a party from raising that issue in a motion for JNOV.

**EXPERT TESTIMONY—STANDARD OF CARE—TITLE COMPANY**

The Court of Appeals held that expert testimony was necessary to establish Petitioner title company's standard of care with regard to the handling of its escrow account. Where there was an allegation of negligence against a title company that involved whether an employee of the title company disbursed funds from the title company's escrow account without the express consent of the individual who deposited the funds in the escrow account, expert testimony was necessary for the trier of fact to establish a title company's duty of care. Because the Respondent did not provide expert testimony, the Court of Appeals concluded that the trial court properly granted the Petitioner title company's motion for judgment on the negligence claim.

Circuit Court for Baltimore County
Case No. 03C12000890
Argued: June 1, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 87

September Term, 2016

_____

SAGE TITLE GROUP, LLC

v.

ROBERT ROMAN

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Greene, J.

_____

Filed: August 4, 2017

On January 26, 2012, Respondent and Cross-Petitioner Robert Roman ("Mr. Roman") sued Petitioner and Cross-Respondent, Sage Title, LLC ("Sage Title" or "Petitioner"),[1] in the Circuit Court for Baltimore County. Respondent alleged in his Complaint that Sage Title committed conversion/theft and negligence.[2] He sought to hold Sage Title liable under a theory of *respondeat superior* for the actions of Sage Title's employee Kevin Sniffen, who, along with Patrick Belzner and Brian McCloskey, according to Mr. Roman, were part of a fraud scheme to which he fell victim. Respondent also sought to hold Sage Title liable under a theory of direct negligence. The parties proceeded to trial, and at the close of Mr. Roman's evidence, Sage Title moved for a judgment with respect to the negligence count, a motion on which the trial court reserved and ultimately granted at the close of Sage Title's case. The jury returned a verdict in favor of Mr. Roman on the conversion count and awarded him $2,420,000 in damages. Sage Title moved for judgment notwithstanding the verdict ("JNOV") on the conversion count, and the trial court granted the motion. Mr. Roman appealed to the Court of Special Appeals, which affirmed the trial court's judgment on the negligence count but reversed the trial court's grant of JNOV with respect to the conversion count. Both parties petitioned this Court for review.

---

[1] Mr. Roman filed claims against Covenant Title Corporation and Sage Title Group, LLC and alleged one count of conversion and theft against Covenant Title Corporation. Mr. Roman and Covenant Title Corporation later settled, and Covenant Title Corporation was dismissed as a defendant.

[2] Mr. Roman in his Complaint also requested an accounting but he later voluntarily dismissed that claim.

## FACTUAL AND PROCEDURAL BACKGROUND
### *Mr. Roman's Transactions with Mr. McCloskey, Mr. Sniffen, and Mr. Belzner*

Mr. Roman's business interests involved making private loans to individuals who buy and renovate homes but do not use bank financing. At trial, Mr. Roman described his loan business as a "bridge" for contractors who cannot qualify for traditional financing from a bank; his "bridge loan" allows a contractor to buy property then either refinance with a traditional bank loan or sell the property after completing renovations. In the late 1990s, Mr. Roman met Brian McCloskey, a superintendent for a local builder. Beginning in the early 2000s, Mr. Roman lent Mr. McCloskey money to buy "old dilapidated house[s]" which "he would gut [] and fix [] up and resell[.]" As of April 2009, Mr. McCloskey owed Mr. Roman over one million dollars in principal and interest.

On April 3, 2009, Mr. McCloskey asked Mr. Roman to come to Sage Title's office because he needed to borrow money to complete a real estate transaction for a property located in York, Pennsylvania ("Columbia York"). There, at Sage Title's office, Mr. McCloskey introduced Mr. Roman to Mr. Sniffen, an attorney and employee of Sage Title, and Patrick Belzner, an associate of Mr. McCloskey. During the meeting, which lasted approximately three and a half hours, the men explained that they would soon need an infusion of cash to establish an escrow account showing liquidity to either the United States Department of Housing and Urban Development or institutional investors for development of the Columbia York project and a marina property in Baltimore City ("Claires Lane"). Mr. McCloskey told Mr. Roman that he would likely be asking for more money in the near future. Mr. Roman testified that Mr. Belzner and Mr. McCloskey explained that the money

in escrow was "to show liquidity to [lenders]." In other words, the money would demonstrate to the lender that there was money to pay interest on the construction loan. Mr. Roman's understanding was that his money would not be used as a bridge loan to Mr. McCloskey, as the two men had arranged in the past, but instead would only be used for purposes of showing liquidity in the escrow account. According to Mr. Roman, Mr. McCloskey told him that once Mr. McCloskey received the United States Department of Housing and Urban Development construction loan, Mr. Roman's money deposited at Sage Title would be returned to him. Mr. Roman testified that Mr. Sniffen was present during this conversation and that he nodded affirmatively, saying "yes" during the discussions. Mr. Sniffen, in contrast, testified that he could not remember the details of the April 3 meeting.

Mr. Roman testified that at the April 3 meeting Mr. McCloskey, Mr. Sniffen, and Mr. Belzner had with them a grocery bag containing $230,000 cash, which they claimed they could not use for the settlement of the Columbia York property. According to Mr. Roman, Mr. McCloskey, Mr. Sniffen, and Mr. Belzner "didn't have any checks and they wanted to give [Mr. Roman] the cash for checks[.]" Mr. Roman testified that "naturally, when you see a lot of cash like that, there's, something is screwy."[3]

---

[3] On that day, April 3, Mr. Roman provided Mr. Sniffen with four checks, totaling $464,000, made payable to "Sage Title Group[.]" In return Mr. McCloskey executed a promissory note undertaking to pay Mr. Roman $240,000 by April 17, and the men gave Mr. Roman the $230,000 in cash to hold as collateral until they could exchange the cash for a check to Mr. Roman. Days later, on April 13, Mr. Roman received a check in the amount of $240,000 from "SAGE TITLE GROUP, LLC Baltimore City Trust Account[.]" Mr. Roman marked the promissory note between Mr. McCloskey and himself in the

On April 13, 2009, Mr. Roman delivered to Mr. McCloskey or Mr. Belzner a $1.5 million cashier's check made payable to "Sage Title Group[,]" with the notation "Robert Roman" on the check's memo line. Mr. Roman did not request a promissory note for the $1.5 million because, as he explained, "it was not a loan" and "not at risk[.]" Later that month, he delivered two more cashier's checks to Mr. McCloskey or Mr. Belzner: one issued on April 20 in the amount of $220,000, and the other issued on April 29 in the amount of $700,000. As with the April 13 check for $1.5 million, both of these checks were made payable to "Sage Title Group" and contained the name "Robert Roman" on the memo lines. Mr. Roman never requested nor received any written explanation of how the funds would be handled. He also did not charge interest on the funds he deposited into the escrow account. Mr. Roman explained at trial his understanding that "it wasn't a loan, it was money going into an escrow account at Sage and it would be mine and I was the only one to have access to it." Mr. Sniffen, on the other hand, indicated that his understanding was that there were no restrictions on the use of the funds other than how Mr. McCloskey directed.

### Sage Title's Baltimore Escrow/Trust Account

Sage Title's Baltimore escrow/trust account is a single account containing funds for all of Sage Title's Baltimore clients. In a recorded deposition, which was played at trial, Michael Maddox ("Maddox"), Sage Title's president at the time of the proceedings, explained that funds are withdrawn from that account when they are ready to be disbursed

---

amount of $240,000 as "Pd 4/13/09[.]" The $464,000 is *not* the subject of Mr. Roman's conversion claim that is at issue before us.

per client instructions. According to Mr. Maddox, the money in Sage Title's escrow/trust account belongs to the clients and Sage Title is not free to do what it wants with the funds; further, the money in the account may only be disbursed upon the client's written instruction.

At trial, Sage Title's executive vice president, Susan Holler also testified. Ms. Holler explained that Sage Title's use of a single ledger allowed the company to track each specific transaction. According to Ms. Holler, you "couldn't tell if it was your dollar that was put in or someone else's dollar that was put in but by using the single ledger balance report, we know how much was deposited for that case and how much needs to be disbursed for that case."

With respect to Mr. Roman's deposits, the Columbia York ledger reflected that a check in the amount of $1.5 million was deposited and "Robert Roman" was listed in the Payee Name Memo line of the ledger. The Claires Lane ledger reflected that checks in the amount of $700,000 and $220,000 were deposited and, again, "Robert Roman" was listed in the Payee Name Memo line of the ledger. Both ledgers identified the "Trust Account" as "BALTIMORE." Mr. Sniffen later testified that by May 25, 2009, he had disbursed funds for the Columbia York and Claires Lane transactions from the trust account at Mr. McCloskey's instruction.

### Sage Title's Termination of Mr. Sniffen

At the end of February, March, and April 2009, Sage Title's accounting department audited the single-ledger balance reports for the escrow account containing the money at issue. The reports show that a series of personal checks from Mr. McCloskey were

deposited into the account by Mr. Sniffen in both March and April, and some of the checks had bounced. Mr. Maddox claims that the accounting department never notified him of this. Instead, the accounting department had contacted Mr. Sniffen to get him to remedy the problem. Ms. Holler testified that she was notified by the accounting department in late March 2009 that at least three of the four personal checks from Mr. McCloskey accepted by Mr. Sniffen had bounced. Ms. Holler testified that she called Mr. Sniffen and warned him to no longer accept personal checks. Ms. Holler also testified that she is "almost positive" that she discussed this issue with Mr. Maddox.

Sometime between late March and early April 2009, after having been warned by Ms. Holler of the company policy, Mr. Sniffen accepted two more personal checks from Mr. McCloskey. Both of these checks bounced and caused an overdraft on the escrow account. Mr. Maddox testified that upon learning that Mr. Sniffen had accepted these two checks, Mr. Maddox immediately placed Mr. Sniffen on leave pending investigation then ultimately terminated him on May 26 for violating company policy.

### Mr. Roman's Continued Transactions with Mr. Sniffen and Mr. McCloskey

Mr. Roman continued to have dealings with Mr. McCloskey, Mr. Belzner, and Mr. Sniffen, even after Mr. Sniffen's termination in May 2009. In June 2010, upon needing to demonstrate his own assets to potential lenders, Mr. Roman sought return of the escrowed funds. Despite execution of a formal agreement in 2011 between Mr. Roman and Mr. McCloskey, Mr. Roman never received the funds. He filed two lawsuits on July 14, 2011: a claim for a confessed judgment against Mr. McCloskey and a four-count complaint against Mr. Sniffen. Thereafter, Mr. Roman filed the present suit.

*Procedural History*

On January 26, 2012, Mr. Roman sued Sage Title, LLC for Count I, "Conversion/Theft," Count II, "Negligence," and Count III, "Accounting." He sought to hold Sage Title liable vicariously for the actions of Mr. Sniffen during his employment with Sage Title. Mr. Roman alleged that Mr. Sniffen, along with Mr. Belzner and Mr. McCloskey, were part of a fraud scheme to which Mr. Roman fell victim. He also sought to hold Sage Title liable for direct negligence for allowing the unauthorized withdrawal of funds and failing to have in place procedures and safeguards to prevent the unauthorized disbursement of Mr. Roman's funds. The Circuit Court for Baltimore County held a three-day trial starting on August 6, 2013.

At the close of Mr. Roman's case, Sage Title moved for judgment, pursuant to Maryland Rule 2-519. In its motion for judgment, Sage Title argued, *inter alia*, that Mr. Roman's monies were commingled and could not, therefore, be converted, that Mr. Roman failed to establish Sage Title's duty to him for purposes of his negligence claim, that Sage Title is not responsible for the acts of Mr. Sniffen, and that Mr. Roman's own negligence bars his claims. The trial court reserved ruling on the motion. Mr. Roman voluntarily dismissed Count III, his claim for an accounting. At the close of all the evidence, Sage Title renewed its motion for judgment. The trial judge granted the motion on the negligence count but denied it on the conversion count. The jury returned a verdict in favor of Mr. Roman on the conversion count, awarding him $2,420,000 in damages. The court entered the judgment on August 16, 2013. Following the verdict, Sage Title moved, pursuant to Md. Rule 2-532, for JNOV. The trial judge granted Sage Title's JNOV on

February 28, 2014, finding that the commingling of funds precluded any claim for conversion. The trial judge ruled, in pertinent part:

[T]here was a variety of evidence that explained how [Sage Title] operates its trust account. First, during Michael Maddox's deposition . . . he testified that the trust account is different from [Sage Title's] operating account . . . [which] pays [Sage Title's] rent, mortgage, employees, and other company expenses. Mr. Maddox further testified that [Sage Title] is not free to do what it wants with the funds in the account. Trial counsel then posed the following scenario: "[a]nd so that if, for instance, I had a file with Sage Title and Ms. Whelihan had a file with Sage Title, you couldn't use the money in Ms. Whelihan's account to pay expenses that happened in my file, could you?" Mr. Maddox then responded with: "[c]orrect, no."

However, there was also testimony that [Mr. Roman's] money was commingled with other funds in [Sage Title's] trust account, which leads this [c]ourt to conclude that [Mr. Roman's] Conversion claim should not have been submitted to the jury. First, during Mr. Sniffen's testimony, he testified that [Sage Title's] trust account was "one large escrow account," where funds were deposited and identified by file so "they would be applied to a certain file" in order to reconcile the file. Mr. Sniffen further provided that all of the money from transactions pertaining to [Sage Title's] Baltimore City office was located in the same escrow account, and with respect to Mr. McCloskey's specific files, other individuals, besides [Mr. Roman], contributed money to these properties. Ledger sheets relating to the two properties at issue further confirm the fact that other individuals contributed money to Mr. McCloskey's properties. In addition to Mr. Sniffen's testimony, Mr. Maddox also provided testimony that [Mr. Roman]'s money was commingled with other funds. Specifically, Mr. Maddox testified that [Sage Title] had one escrow account for each office, further indicating that "all of the funds from every transaction that goes through that office are commingled into that one escrow account." However, Mr. Maddox did testify that [Sage Title] accounts separately for each individual file.

Finally, Ms. Holler also provided testimony that [Mr. Roman]'s funds were commingled with other funds. Specifically, Ms. Holler testified that there were other sources of funds in [Sage Title's] escrow account besides [Mr. Roman's]. Ms. Holler also confirmed that [Mr. Roman's] deposit went in with all of the other deposits in [Sage Title's] Baltimore City escrow account. Furthermore, with respect to the funds in the trust account, [Sage Title] cannot identify the exact dollar that is being withdrawn or disbursed. Instead,

[Sage Title] can only identify the exact amounts that are deposited and how much needs to be disbursed.

In sum, Mr. Sniffen, Mr. Maddox, and Ms. Holler's testimony all support the conclusion that [Mr. Roman's] money was commingled with other funds in [Sage Title's] Baltimore City escrow account and also with funds contributed towards Mr. McCloskey's properties. Although [Sage Title] accounts separately for each file, it does not solve the problem that [Mr. Roman's] money was commingled with other funds. [Sage Title] can only track the exact amounts that were deposited and required to be disbursed, but it cannot tell whose dollar is actually being disbursed. Because [Mr. Roman's] money was commingled with other money in [Sage Title's] Baltimore City escrow account and with other money contributed towards Mr. McCloskey's properties, [Mr. Roman] cannot bring a Conversion claim.

Sage Title raised two alternative arguments to support its motion for JNOV. It argued that because Mr. Sniffen's acts were outside the scope of employment, Sage Title cannot be held responsible under *respondeat superior* and that Mr. Roman's claim was precluded by the unclean hands, or *in pari delicto*, doctrine. The court rejected both arguments and concluded that not only did Sage Title waive any argument regarding foreseeability of Mr. Sniffen's misconduct under *respondeat superior* as well as waive the unclean hands, or *in pari delicto*, argument, both arguments substantively failed on the merits. Mr. Roman noted an appeal to the Court of Special Appeals. The intermediate appellate court reversed the judgment in part, holding that the money was identifiable for purposes of a conversion claim because it was in an escrow account. *Roman v. Sage Title Grp., LLC*, 229 Md. App. 601, 612–18, 146 A.3d 479, 485–88 (2016). The Court of Special Appeals held that Sage Title's defense to vicarious liability, although preserved, failed on the merits and that its defense of unclean hands had not been preserved. *Roman*, 229 Md. App. at 618–23, 146 A.3d at 488–92.

Sage Title subsequently filed a petition for certiorari and Mr. Roman filed an answer and conditional cross-petition. This Court granted *certiorari* on both the petition and cross-petition.

Sage Title poses the following questions in its petition for certiorari:

(1) Was the Court of Special Appeals correct to create an "escrow account" exception to the rule against conversion claims involving commingled funds?

(2) If an employee violates company policy without breaking the law, is a later serious crime foreseeable to the employer?

(3) Must the doctrine of unclean hands/*in pari delicto*, which is a question for the court, be invoked in a Rule 2-519 motion before submission to the jury?

Additionally, Mr. Roman poses the following questions:

(1) Can a defendant in a conversion claim for money avoid liability with a "commingling" defense if that defendant was entrusted with specific, identifiable funds and agreed with the plaintiff to place those funds in an escrow account to which only plaintiff would have access?

(2) Was the Court of Special Appeals correct to find that expert testimony was necessary to prove Roman's negligence claim, where Sage Title wrongfully transferred Roman's money—which it agreed it would hold for Roman and to which only Roman would have access—to third parties without Roman's authority?

(3) Was the Court of Special Appeals correct to find that Petitioner preserved for review its argument that its employee's conduct was not foreseeable and, therefore, not within the scope of his employment, when no such argument was made at any time before Sage Title's motion for JNOV?

*Sage Title Grp. v. Roman*, 451 Md. 578, 155 A.3d 434 (2017).

## STANDARD OF REVIEW

Upon review of a trial court's grant or denial of a motion for JNOV, made pursuant to Maryland Rule 2-532, we review whether the trial court's decision was legally correct.

- 10 -

*Exxon Mobil Corp. v. Albright*, 433 Md. 303, 349, 71 A.3d 30, 58 (2013).  We must "resolve all conflicts in the evidence in favor of the [non-moving party] and must assume the truth of all evidence as may naturally and legitimately be deduced therefrom which tend to support the plaintiff's right to recover."  *Id.*  (quoting *Smith v. Bernfeld*, 226 Md. 400, 406, 174 A.2d 53, 55 (1961)).  "If the non-moving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the judgment notwithstanding the verdict should be denied."  *Cooper v. Rodriguez*, 443 Md. 680, 707, 118 A.3d 829 (2015) (quoting *Barnes v. Greater Balt. Med. Ctr., Inc.*, 210 Md. App. 457, 480, 63 A.3d 620, 633–34 (2013)).

**DISCUSSION**

**I. Conversion**

*Parties' Contentions*

Sage Title argues that the Court of Special Appeals carved out an "escrow account" exception to the general rule that money cannot be the subject of a conversion claim as we articulated in *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 562, 731 A.2d 957, 965 (1999). Petitioner contends that the "escrow account" exception is an inappropriate "judicial innovation" where the General Assembly has not enacted a civil theft statute of general application.  Sage Title maintains that expanding the tort of conversion with an escrow account exception would be a departure from *stare decisis* that commingled money loses its identity, and, thus, urges this Court to adopt a narrow view of the escrow account exception to the commingling defense to a conversion claim.  It relies on language in our opinion in *Jasen*, where we explained that "monies are intangible and therefore not subject

- 11 -

to a claim of conversion. An exception exists, however, when a plaintiff can allege that the defendant converted specific segregated or identifiable funds." *Id*. at 564, 731 A.2d at 966 (internal citations omitted). The facts of this case, Petitioner suggests, do not support an application of the *Jasen* exception to the commingling rule because Mr. Roman's funds were not identifiable.

Further, Sage Title contends that the expansion of the intentional tort of conversion and its application to title companies could have adverse insurance implications for Maryland businesses because liability insurance coverage may depend on the distinction between negligence and intentional torts. Finally, Petitioner rejects the analogy used by the Court of Special Appeals to compare a title company's escrow account to an attorney's escrow account because "escrow accounts other than attorney trust accounts are subject to the common law of fiduciary responsibilities, not to the specific, detailed rules applicable to attorney trust accounts."

Mr. Roman, in contrast, advances the view that the Court of Special Appeals did not err when it reversed the trial court's grant of Sage Title's motion for JNOV on the conversion claim because the intermediate appellate court properly applied the *Jasen* exception and determined that Mr. Roman's funds were sufficiently identifiable. Mr. Roman disputes the characterization that the Court of Special Appeals created a new escrow account exception in addition to the already-existing "specific segregated or identifiable funds" exception. He argues that his funds were specifically identifiable because Sage Title's ledger identified in detail all of the deposits into the escrow account, the identity of the person whose money was deposited, every disbursement that was made

from the escrow account and the person to whom the money was disbursed. Mr. Roman emphasizes that the deposit of his funds into a common escrow account that also held other people's escrowed funds "had absolutely no effect" on Sage Title's ability to identify Mr. Roman's funds. Finally, Mr. Roman advances an alternative argument, as he did before the Court of Special Appeals, that even if this Court were to hold that the deposit of his funds into Sage Title's common escrow account constituted commingling, it makes no difference, because the funds should have been segregated in a separate escrow account. Thus, once Mr. Sniffen and Sage Title handled the funds entrusted to them by Mr. Roman for a specific purpose in contravention of that stated purpose, conversion of those funds occurred *before* there was any commingling of funds.

### Conversion Claims for Escrowed Money

Conversion, historically known as trover, is defined under modern law as "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Jasen*, 354 Md. at 560, 731 A.2d at 963. Traditional views of the tort of conversion did not permit a claim for conversion with regard to intangible property because, by its very nature, intangible property cannot be lost or found. *Id*. Over time, however, courts have relaxed the general rule, though not so far as to "extend the tort further, to cover completely intangible rights[.]" *Id*. at 562, 731 A.2d at 965. We articulated in *Jasen* an exception to the general rule that "when a plaintiff can allege that the defendant converted specific segregated or identifiable funds[,]" a conversion claim for money may survive. *Id.* at 564, 731 A.2d at 966. As we explained there, conversion claims "generally are recognized in connection with funds that have been

- 13 -

or should have been segregated for a particular purpose or that have been wrongfully obtained or retained or diverted in an identifiable transaction." *Id.* at 565, 731 A.2d at 966 (internal quotation marks omitted).

In applying the principles of the conversion exception to the facts of *Jasen*, this Court concluded that a conversion claim could not survive. In that case, Allied Investment Corporation and Allied Venture Partnership, lenders, sought declaratory judgments with respect to their secured interests in shares of a corporate stock, a collateral assignment of a partnership interest, and the proceeds from each. *Jasen*, 354 Md. at 551–52, 731 A.2d at 959. "A guarantor of loans pledged to the lenders, [Allied Investment Corporation and Allied Venture Partnership], as collateral, all of his interests in a limited partnership [Ashmere Partnership] and shares in a corporation [Ashmere Corporation], including the right to the proceeds from both." *Id.* at 551, 731 A.2d at 959. Mr. Jasen had purportedly purchased the same interests from the guarantor, and upon doing so, notified the lenders that the assignment of collateral was null and void. *Id.* We determined, *inter alia*, that the lenders would have been entitled to the proceeds of the Ashmere Partnership Interests and proceeds of the Ashmere Corporate Shares but that the proceeds from either interest were neither readily identifiable nor maintained in a separate, segregated account. *Id*. at 566, 731 A.2d at 967. This Court explained that there was no allegation with respect to "any identifiable dollar amounts of profits, assets, distributions, dividends, or other monetary reward . . . [.]" *Id.* We concluded that the proceeds could not be subject to the tort of conversion. *Id.* Although a claim for conversion could not be sustained in that case, we

explored the circumstances under which conversion claims may be recognized when funds have been or should have been segregated for a particular purpose.

Further, in *Jasen*, we cited *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 732 F.2d 859 (11th Cir. 1984), which involved a claim of conversion against a broker who had transferred money out of a mutual fund account without the owner's consent. *Id.* at 861. The mutual fund account, called a "Ready Assets Trust Account," was described as a "hybrid, with both cash and stock account characteristics." *Id.* at 862. In applying the rationale that money must be specifically identifiable to be the subject of a conversion claim, the court cautioned that the "money at issue must be 'described with such reasonable certainty that the jury may know what money is meant and the defendants protected from another action based upon the same grounds.'" *Id*. at 862. Without classifying the account as either cash or stock, the *Limbaugh* court held that funds, contained in that account in the form of shares, were sufficiently identifiable to support an action for conversion. *Id*. at 862–63. The court's focus was on the ability to identify the funds, and not whether the funds were best characterized as cash or stock, because "neither interpretation bar[red]" the conversion claims. *Id.* at 863.

In the case at bar, we must determine whether funds held in an escrow account are commingled such that they are no longer specifically identifiable, and, thus, no longer subject to a claim of conversion. In doing so, we consider, as the Court of Special Appeals did, the definition of commingling. "Commingling" is defined as "a mixing together, esp. a fiduciary's mixing of personal funds with those of a beneficiary or client." *Commingling definition*, BLACK'S LAW DICTIONARY (10th ed. 2014). For example, the act of

- 15 -

commingling escrowed funds may include the mixing of client's funds with other client's funds or the personal funds of the fiduciary agent. Funds held in an escrow account do not lose identifying features simply by virtue of being deposited in such an account because an escrow account contains the funds of a client or third party, rather than personal funds of the fiduciary. In this case, Sage Title's personal funds would be held in its operating account. As the Court of Special Appeals noted, the physical location of funds in the same account with other funds is not dispositive of commingling. *See Roman*, 229 Md. App. at 617.

According to Mr. Maddox's testimony, Sage Title's escrow account was "absolutely" different from Sage Title's operating account. Mr. Roman's attorney asked Mr. Maddox to clarify the differences between the two accounts:

> [COUNSEL]: The operating account, you pay [the] company's rent or mortgage payments, you pay your employees, you pay the company's expenses out of, correct?
> [MADDOX]: Yes.
> [COUNSEL]: The trust account, basically, houses other people's money with the exception maybe of the fees that you're going to be paid at settlement, it's somebody else's money, correct?
> [MADDOX]: Yes, it is.
>              *           *           *
> [COUNSEL]: All right. The title company isn't free to do what it wants with those funds, correct?
> [MADDOX]: That's correct
>              *           *           *
> [COUNSEL]: You're not free to commingle those funds with your own, right?
>              *           *           *
>  [MADDOX]: When you say with your own, I mean, all title companies have an escrow account that are commingled funds from lenders, investors, etcetera, but they can't be part of our operating account.
>              *           *           *

- 16 -

> [COUNSEL]: But you have to count, within the trust account, strictly almost, well, to the penny for every dollar that comes in and goes out, correct?
>
> [MADDOX]: Yes.

Ms. Holler's testimony confirmed that Sage Title had the ability to track the amount of money going in and out of its escrow account. She explained that, "a trust account is like, it's just one big account that all of the funds for the different transactions that are being held are placed into that account. . . . If you put money in and take money out, you can't necessarily identify that that's the exact dollar that was, that went in, but you can identify that it's the exact, it's the same amount [] that went in and out." When asked why Sage Title has money in an escrow account, Ms. Holler testified that the money in escrow "is so that we can fund the transactions based upon the instructions, written instructions, that we get from our clients or third parties." Neither party disputes that Mr. Roman's funds were maintained, until they were disbursed, in Sage Title's trust account. Finally, there is no dispute that all of Mr. Roman's funds were disbursed from the trust account.

Mr. Roman's funds were not commingled in Sage Title's escrow account to the extent that they were no longer identifiable as Mr. Roman's money or funds in escrow. *See Jasen*, 354 Md. at 564, 731 A.2d at 966 ("An exception exists when a plaintiff can allege that the defendant converted specific segregated or identifiable funds."). Mr. Maddox explained that the single ledger balance report reflected all transactions for a particular file, and, further, he confirmed that the ledger showed entries for three checks totaling $2,420,000 that had been deposited between the period of April 14, 2009 and May 5, 2009. In addition to the amount of each check and the date of the transaction, the ledger identified "Robert Roman" as the Payee of each transaction as well as the date that each check

- 17 -

cleared. Mr. Roman also identified each deposit by reference number and the amount of each of the three checks that had been deposited into Sage Title's escrow account.

By Ms. Holler's own testimony, Sage Title confirmed that the funds that had been deposited in the escrow account by Mr. Roman could be identified as "the exact, it's the same amount that, that went in and out." Furthermore, there is no question about how much of the $2,420,000 of Mr. Roman's three deposits had been disbursed by Mr. Sniffen. Mr. Sniffen testified that by May 25, 2009, he had disbursed all of the funds for the Columbia York and Claires Lane transactions from Sage Title's escrow account. We agree with the Court of Special Appeals and conclude that Mr. Roman identified the specific funds that were the subject of the conversion claim. His identification of the funds was "'with such reasonable certainty that the jury [knew] what money [wa]s meant'" to be segregated. *Jasen*, 354 Md. at 565, 731 A.2d at 966 (quoting *Limbaugh,* 732 F.2d at 862). We hold that there was sufficient evidence presented to the trier of fact for it to determine that Mr. Roman's funds had been converted on the basis that the funds remained specifically identifiable in the escrow account and were not commingled as alleged.

Petitioner urges us to reject the Court of Special Appeals' analogy between a title company's escrow account and an attorney's escrow account because the stringent rules applicable to attorney trust accounts do not extend to escrow accounts in general. Although the oversight and regulations of an attorney's escrow and operating accounts differ from a title company's escrow and operating accounts, the analogy is nevertheless helpful to explain the nature of money in an escrow account for purposes of a claim of conversion. In *Attorney Grievance Comm'n v. Cherry-Mahoi*, 388 Md. 124, 154, 879 A.2d 58, 76

(2005), the attorney had deposited into her attorney trust account funds that she had received on behalf of a client from a settlement and personal injury protection ("PIP") funds.[4] The attorney withdrew $6,625 from her trust account, even though she had earned only $3,663 for handling the client's personal injury matter. *Id.* We determined that this act was a conversion of client's funds in violation of Maryland Rules of Professional Conduct 1.16(d). *Id.* at 157, 879 A.2d at 79. Additionally, we determined that the attorney violated the Maryland Rules of Professional Conduct 1.15(a) by commingling funds when she deposited personal funds into the trust account which contained monies from her client's personal injury matter. *Id*. at 156, 879 A.2d at 78. The context of the *Cherry-Mahoi* case informs the nature of an escrow account as a separate and distinct holding place for funds that should not be mixed with the fiduciary's personal funds. The case further highlights that the comingling of funds in an escrow/trust account did not change the nature of that account to preclude the attorney's conversion of client funds when she withdrew money to which she was not entitled.

## II. *Respondeat Superior*

### *Parties' Contentions*

Sage Title argues that the Court of Special Appeals unjustifiably expanded an employer's vicarious liability by holding the employer responsible when an employee commits a serious crime. Mr. Sniffen's conduct of depositing personal checks into the

---

[4] The attorney had agreed to hold the personal injury protection funds ("PIP") in trust to pay her client's unpaid medical expenses. *Cherry-Mahoi*, 388 Md. at 132, 879 A.2d at 63.

escrow account, according to Sage Title, was a non-criminal violation of company policy, and, thus, did not make his serious crime of theft foreseeable to the extent that Sage Title would be liable. Petitioner relies on *Fearnow v. Chesapeake & Potomac Tel. Co. of Md.,* 104 Md. App. 1, 51, 655 A.2d 1, 25 (1995), *aff'd in relevant part and rev'd in part on other grounds*, 343 Md. 363 (1996), for the proposition that an employer cannot be liable for a serious crime of its employee, absent evidence that the employer was aware of other crimes that made the employee's conduct reasonably foreseeable. Sage Title asserts that "there is nothing illegal, unethical, or immoral inherent in depositing personal checks in escrow" and emphasizes that a serious crime is different from a violation of company policy.

Mr. Roman maintains, as he did in the Court of Special Appeals, that Sage Title has waived its foreseeability argument. According to Respondent, Sage Title failed to raise *respondeat superior* in its motion for judgment at the close of all of the evidence, and, therefore, did not conform to the requirements of Maryland Rule 2-532(a), which mandates that a party moving for JNOV is strictly limited to the factual and legal grounds presented to the trial court in a motion for judgment made at the close of all of the evidence. Mr. Roman argues that the Court of Special Appeals wrongly concluded that Sage Title renewed the issue of *respondeat superior* when it renewed its motion for judgment at the close of all of the evidence, simply because Sage Title had referenced a memorandum that had been previously submitted to the court. Further, Respondent maintains that Sage Title's argument at the close of all of the evidence contradicted its position that it had preserved the scope of employment/foreseeability argument because at the close of

- 20 -

evidence Sage Title repeatedly pressed the theory that Mr. Sniffen had not acted improperly.

If Sage Title did not waive its defense to the *respondeat superior* claim, Respondent argues that Mr. Sniffen acted within the scope of his employment. He relies on the language in *Barclay*, which provides that the focus in determining whether an employee acted within the scope of his employment is whether the acts were "in furtherance of the employer's business and authorized by the employer[.]" *Barclay v. Briscoe*, 427 Md. 270, 283, 47 A.3d 560, 568–69 (2012). According to Mr. Roman, there was sufficient evidence for the jury to consider that Mr. Sniffen's conduct was in furtherance of Sage Title's business and was authorized by Sage Title because Mr. Sniffen's responsibilities included taking deposits, signing checks and making disbursements from the escrow account.

### *Preservation of the Respondeat Superior Argument*

Md. Rule 2-532(a) states that "a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motions." We have previously observed that Md. Rule 2-532 "was never meant to be simply a guide to follow but rather to set forth a precise and unambiguous requirement for the trial court." *Gen. Motors Corp. v. Seay*, 388 Md. 341, 355, 879 A.2d 1049, 1057 (2005). When moving for judgment, pursuant to Md. Rule 2-519(a), a party "shall state with particularity all reasons why the motion should be granted." As we have explained,

> [T]he sufficiency of the particularity of the reasons for a Rule 2-519(a) motion is determined in light of legal arguments that have been made in the court of the action, with particular emphasis on whether the trial judge could

- 21 -

identify, through a process analogous to incorporation by reference, the argument that was being made in support of the motion.

*Nelson v. Carroll*, 350 Md. 247, 250, 711 A.2d 228, 229 (1998). In that case, we cited with approval the intermediate appellate court's conclusion that "upon 'renewal' of a motion for judgment at the close of all the evidence, reference to a memorandum, previously submitted to the court, which sets forth with particularity the arguments in support of the motion is sufficient compliance with Md. Rule 2-519(a)." *Id.* at 254, 711 A.2d at 231 (citing *Laubach v. Franklin Square Hosp.*, 79 Md. App. 203, 216, 556 A.2d 682, 689 (1989)).

We agree with the Court of Special Appeals that Petitioner preserved its argument with respect to *respondeat superior*. At the close of Mr. Roman's case, Sage Title moved for judgment and submitted a memorandum in support of its motion. In that memorandum, Sage Title argued, albeit briefly, that it could not be liable for "illegal activity" on the part its employee, Mr. Sniffen. The trial court reserved its ruling on Sage Title's motion for judgment. Sage Title renewed its motion at the close of all of the evidence, and, in one exchange, the trial judge pressed Sage Title's counsel to explain why *respondeat superior* was not at issue:

> [COURT]: [W]hat that argument goes to though is . . . that doesn't absolve Mr. Sniffen of his [] conduct, [] his culpability [], which under respondeat superior, could then be
>
>                  *              *              *
>
> [COURT]: Could then be [] transferred, vicariously transferred [] to this principal.
>
> [COUNSEL]: Right, but what is it that Mr. Sniffen does wrong in 2009? I mean, there's no evidence of that. That's the problem that Mr. Roman has is Mr. Sniffen says I didn't get any instructions from Mr. Roman . . . .

The trial court denied Sage Title's motion for judgment with respect to conversion and the *respondeat superior* argument and submitted those issues to the jury. Sage Title then repeated its scope of employment argument in a memorandum submitted in support of its Motion for JNOV. Our consideration is whether the trial judge "could identify, through a process analogous to incorporation by reference, the argument that was being made in support of the motion." *Nelson*, 350 Md. at 250, 711 A.2d at 229. Given the supporting memorandums as well as the colloquy between the court and Sage Title's counsel, we determine that the court could identify the argument that was being made in support of Md. Rule 2-519(a) and Md. Rule 2-532(a) motions. Sage Title, therefore, preserved the issue of *respondeat superior* under Md. Rule 2-519(a) for purposes of its Motion for JNOV.

### *Respondeat Superior*

We have discussed previously when an employer may be held responsible for the tortious conduct of its employee. In *Barclay v. Briscoe*, we held that

> for an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer. Ordinarily, the issue of whether a particular act is within the scope of employment is properly decided by a jury, however, where there is no conflict in the evidence relating to the question and but one inference can be drawn therefrom, the question is one of law for the court.

427 Md. at 283, 47 A.3d at 560 (internal quotation marks and citations omitted). *See Fearnow v. Chesapeake & Potomac Telephone Co. of Maryland*, 104 Md. App. 1, 52, 655 A.2d 1, 26 (1995), *rev'd in part on other grounds,* 342 Md. 363, 676 A.2d 65 (1996) (noting that "an employer cannot be held liable for the criminal acts of an employee, unless they

- 23 -

were committed during the course of employment and to further a purpose or interest, however excessive or misguided, of the employer."). *See also* William L. Prosser, *Torts* § 70, at 464-65 (4th ed. 1971); *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467, 470 (1991). That an act is "consciously criminal or tortious" does not preclude it from falling within the scope of employment. RESTATEMENT OF AGENCY (SECOND) § 231 (1958).

The "simple test" remains whether the employee's acts "were within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him." *Sawyer*, 322 Md. at 255, 587 A.2d at 470. Express authorization is not required. The analysis considers, instead, "whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders." *Id*. Another factor is whether the "employee's conduct was 'expectable' or 'foreseeable'." *Sawyer*, 322 Md. at 256, 587 A.2d at 470. *See also Holmes v. Gary Goldberg & Co., Inc.*, 838 N.Y.S.2d 105, 106 (N.Y. App. Div. 2007) ("While such vicarious liability does not arise from acts that are committed for the employee's personal motives unrelated to the furtherance of the employer's business, those acts which the employer could reasonably have foreseen are within the scope of the employment and thus give rise to liability under the doctrine of respondeat superior even when those acts constitute an intentional tort or a crime." (internal citations omitted)).

- 24 -

Here, the Circuit Court for Baltimore County provided instructions to the jury that accurately reflected these common law principles regarding scope of employment and *respondeat superior*:

> An employer is responsible for the injuries or damages caused to others by acts of employees if the acts causing the injuries or damages were within the scope of the employment.

> An employee is acting within the scope of employment when performing services for which the employee has been engaged or when the employee is acting in furtherance of the employer's interests even though forbidden or done in a forbidden or criminal manner, if [the] actions are within the scope and in furtherance of the employer's business and the harm complained of was foreseeable.

There was evidence adduced at trial that Mr. Sniffen was acting within the scope of his employment. Mr. Maddox and Ms. Holler's testimony confirmed that Mr. Sniffen was authorized to deposit checks into Sage Title's escrow account. Mr. Maddox testified that as the title branch manager Mr. Sniffen oversaw the daily operations of Sage Title's Baltimore branch, conducted settlements, and issued title policies. In addition, Mr. Sniffen was authorized to "take deposits . . . [and] put them into the escrow account . . . and sign checks and make disbursements from the escrow account." Ms. Holler confirmed that Mr. Sniffen had in fact deposited uncertified funds in the form of personal checks during the time period of "late March or early April."

Furthermore, testimony at trial revealed that Mr. Sniffen had violated Sage Title's policy by depositing in the escrow account at least two personal checks *prior* to the deposit of Mr. Roman's funds. Ms. Holler testified that she called Mr. Sniffen and warned him to no longer accept personal checks and that she was "almost positive" that she had discussed

- 25 -

the issue with Mr. Maddox. For his part, Mr. Maddox claimed that rather than notify him, the accounting department contacted Mr. Sniffen directly to remedy the issue of overdrawn funds in the escrow account. Nevertheless, Mr. Maddox terminated Mr. Sniffen on May 26, 2009 after he had again deposited personal checks in the escrow account and had overdrawn the escrow account.

Mr. Sniffen's conduct of depositing Mr. Roman's checks, and later disbursing the funds from escrow, was in furtherance of Sage Title's business of providing settlement services. Furthermore, Sage Title authorized Mr. Sniffen to deposit checks and disburse funds from its escrow account. There is no question that Mr. Sniffen was acting "in furtherance of the employer's business and authorized by the employer." *Barclay*, 427 Md. at 283, 47 A.3d at 568–69. Mr. Sniffen's duties as the title branch manager were precisely "to generate business, process [] the business that he brought in, conduct settlements, oversee closings, oversee a staff for the office" and to "take deposits . . . [and] put them into the escrow account . . . [and] sign checks and make disbursements from the escrow account." As to the foreseeability of Mr. Sniffen's conduct relative to Sage Title's liability, Sage Title's executive vice president knew that Mr. Sniffen had deposited at least two personal checks in the escrow account prior to Mr. Sniffen's acceptance and deposit of Mr. Roman's funds in that account. We conclude, therefore, that, when viewed in a light most favorable to the non-moving party, there was sufficient evidence before the trier of fact to show that Mr. Sniffen's conduct was in furtherance of Sage Title's business and was authorized by Sage Title and that his conduct was foreseeable because Sage Title had

knowledge that Mr. Sniffen had previously violated its policy about uncertified, personal checks.

### III. Unclean Hands/*In Pari Delicto*

Sage Title argues that the doctrine of unclean hands/*in pari delicto* bars Respondent's conversion claim because he knew that his funds were being used to show false liquidity, and, further, that it has not waived this argument because the doctrine is not subject to the preservation requirements of Md. Rule 2-519. In its brief, Petitioner suggests that "the better course" may have been for the trial court "to deem Sage Title's motion [for JNOV] as having been made under [Md.] Rule 2-535 [Revisory Power], since the doctrine is not a jury question and was not submitted to it" and urges us to accept that the preservation requirements of Md. Rule 2-519 do not apply to a non-jury question. Furthermore, Petitioner points us to *Mona v. Mona Elec. Grp., Inc.*, 176 Md. App. 672, 710, 934 A.2d 450, 472 (2007), in which the Court of Special Appeals affirmed a trial court's *sua sponte* raising the doctrine of unclean hands at a JNOV hearing and entering JNOV, in part, on that basis. We decline Sage Title's invitation to rewrite the "precise rubric" of the Maryland Rules. *See Seay*, 388 Md. at 356, 879 A.2d at 1057.

As we discussed *supra*, when a party has previously moved for judgment at the close of all of the evidence, and subsequently moves for JNOV, the party's motion for JNOV is limited only to the grounds advanced in support of its earlier motion for judgment. Md. Rule 2-532(a). The trial judge aptly noted the futility of Sage Title raising the argument of unclean hands, for the first time, in its motion for JNOV:

[T]he specific ground that [Sage Title] now presents with respect to this defense was not presented in its written motion and during its oral motion, as required by Rule 2-532(a). By failing to present this argument, the purpose of the particularity requirement of Rule 2-519 is not fulfilled. [Sage Title] presented to the court in its motion for judgment that [Mr. Roman] had unclean hands, because he was essentially negligent and did not have instructions on his money or involve his lawyer. However, the court was not presented with the argument that [Mr. Roman] was aware of the fraudulent nature of the scheme, which therefore prevented the court from evaluating this specific argument. As a result, the court finds that [Sage Title] waived this argument.

We hold, therefore, that Sage Title waived its unclean hands/*in pari delicto* argument because it failed to articulate this ground in its motion for judgment and could not "renew" the argument for purposes of its JNOV motion.

## IV. Expert Testimony for a Title Company's Standard of Care

### *Parties' Contention*

Turning to the final contention raised before us, Respondent urges us to reverse the holding of the Court of Special Appeals with respect to the requirement of expert testimony to establish the standard of care for a title company's handling of its escrow/trust account involving its customers and third parties. Sage Title moved for judgment, pursuant to Md. Rule 2-519, on Mr. Roman's negligence claim on the basis that he lacked expert testimony to establish Sage Title's standard of care. The trial court granted Sage Title's motion, which the Court of Special Appeals affirmed. *Roman*, 229 Md. App. at 630, 146 A.3d at 496.

Mr. Roman submits that expert testimony was not required because no explanation is necessary to establish "that a title company [may] not give away a person's money to a third party without permission." He argues that the parties did not dispute the *adequacy* of

Sage Title's procedures, which might require expert testimony, but rather whether Sage Title had any policies, procedures, guidelines, or safeguards in place to prevent unauthorized disbursement of funds. According to Respondent, expert testimony was not required to confirm the absence of such policies. He distinguishes this Court's holding in *Schultz v. Bank of Am.*, 413 Md. 15, 35, 990 A.2d 1078, 1090 (2010), from the instant case, on the basis that in *Schultz*, this Court was concerned with protecting bank customers from imposters, coercion, and forgeries. The issues in *Schultz*, Mr. Roman contends, were more complicated than those in his case. In response, Sage Title argues that "[d]uties of care do not arise in a vacuum" and that because Mr. Roman's name was not on the account and Mr. McCloskey, not Mr. Roman, was Sage Title's customer, a duty, if any, owed to Mr. Roman would not have been obvious to the jury.

When establishing "a cause of action for negligence, a plaintiff must prove the existence of four elements: a duty owed to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Jacques v. First Nat'l Bank*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986). Where the plaintiff alleges negligence by a professional, "expert testimony is generally necessary to establish the requisite standard of care owed by the professional." *Jones v. State,* 425 Md. 1, 26, 38 A.3d 333, 347 (2012). We have explained that the reason for the rule is that "experts are usually necessary to explain professional standards because such standards require specialized knowledge within the professional's field that are generally 'beyond the ken of the average layman.'" *Id.* (citing *Schultz*, 413 Md. at 28, 990 A.2d at 1086). There is, however, an exception to the general rule that

- 29 -

expert opinion is necessary to establish the standard of care for a professional when "the alleged negligence, if proven, would be so obviously shown that the trier of fact could recognize it without expert testimony." *Schultz*, 413 Md. at 29, 990 A.2d at 1086.

We have not had occasion to review the standard of care of a title company; however, the analogous nature of financial transactions in *Schultz* is instructive here. In that case, Mr. Schultz, as personal representative of his father's estate, brought suit against Bank of America and alleged negligence on the bank's part for adding the name of his father's caregiver to Schultz's father's checking account. *Id.* at 21, 990 A.2d at 1082. Schultz alleged that the caregiver either coerced his father to add her name to the account or that she added her name to the account through forgery. *Id.* After her name was added to Schultz's father's checking account, she withdrew funds from the account. *Id.* On the issue of whether expert testimony was required to establish a bank's standard of care, we reasoned that the average person may not have experience in adding a name to his or her bank account and that, even so, the process occurs "behind closed doors" by the bank officer, not the bank customer. *Id.* at 35, 990 A.2d at 1090. Additionally, we observed that banking practices are influenced by technological advances. *Id.* We held that expert testimony was necessary to establish a bank's standard of care when adding a customer to an account. *Id.*

Relying on *Schultz*, the Court of Special Appeals, in the case *sub judice*, concluded that expert testimony was required to establish Sage Title's negligence. First, the intermediate appellate court noted that "most lay people are not familiar with the operation of escrow accounts, nor with any standard of care a title company owes to individuals or

entities who are not customers, but who deposit funds in escrow with the title company." *Roman*, 229 Md. at 629, 146 A.3d at 495. Additionally, the Court of Special Appeals echoed *Schultz* when it observed that "Sage Title's procedures and safeguards would 'occur behind closed doors, out of sight of the customer, and may involve numerous unknown procedures'[.]" *Id.*

We hold that expert testimony was necessary to establish Sage Title's duty to Mr. Roman. Respondent's attempt to limit *Schultz*'s holding to instances of fraud, coercion or forgery is unavailing. We are not convinced that most people have experience involving transactions with a title company. Nevertheless, as was true of a banking customer in *Schultz*, a customer of a title company or third party would not be aware of the policies and procedures, if any, that a title company had in place with regard to handling its escrow account. Furthermore, as the Court of Special Appeals pointed out, the parties here were "sophisticated developers accustomed to working with title companies and multiple parties to move large sums of money in and out of escrow accounts[,]" *Roman*, 229 Md. at 629, 146 A.3d at 495; as such, an acceptable standard of care would have been "beyond the ken of the average layman." *See Jones,* 425 Md. at 26, 38 A.3d at 347.

**CONCLUSION**

Upon review of Sage Title's motion for JNOV, which requires use to determine whether the trial court's decision was legally correct, we resolve conflicts in the evidence in favor of the non-moving party. We are mindful that when conducting an inquiry as to a dispute of facts or inferences, a "judge shall not impose the solution he prefers if another solution may rationally be adopted" but that "[t]he choice, as this Court has repeatedly

decided, is for the jury." *Wood v. H. W. Gossard Co.*, 204 Md. 177, 186, 103 A.2d 130, 136 (1954). In the case before us, Respondent's evidence constituted more than mere speculation or conjecture that Mr. Sniffen converted Mr. Roman's funds and that Sage Title was liable under *respondeat superior*. The motion for JNOV should have been denied as to the conversion claim, because that issue was properly before the jury, and the jury was correct in entering its verdict on that count in favor of Mr. Roman. The trial court correctly granted Sage Title's motion for judgment as to the negligence count. Thus, the intermediate appellate court properly reversed the trial judge's grant of the motion for JNOV with regard to the conversion count and properly affirmed the trial judge's grant of the motion for judgment on Mr. Roman's negligence count.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT TO BE PAID 90% BY PETITIONER AND 10% BY RESPONDENT.**